Alejandro BRUNI, Appellant,

v.

The STATE of Texas, Appellee.

No. 3–83–115–CR.

Court of Appeals of Texas,
Austin.

April 4, 1984.
Rehearing Denied April 25, 1984.

Charles R. Kimbrough, Blundell & Moore, Lockhart Appointed Counsel, for appellant.

Jeffrey Van Horn; Criminal Dist. Atty., Lockhart, for appellee.

Before SHANNON, SMITH and GAMMAGE, JJ.

EARL W. SMITH, Justice.

Alejandro Bruni appeals from a judgment of conviction of theft on or about May 27, 1977, of property valued at over $10,000, a second degree felony prior to the 1983 amendments to Tex.Pen.Code Ann. § 31.03 (1974). Punishment was assessed by the court, after a jury verdict of guilty, at confinement in the Department of Corrections for ten years and a fine of $10,000. The court found that restitution was due to victims in the amount of $47,173, apportioned as follows: $43,173 due John and Betty Ross and $4,000 due Ann Niemann.

Bruni assigns four grounds of error: (1) that the evidence is insufficient to sustain the conviction; (2) that the trial court erred in permitting evidence before the jury of confidential communications between Bruni and his former spouse during the marriage relationship; (3) that the trial court erred in its judgment and sentence in finding that restitution was due to certain individuals who were not victims of the offense as alleged by indictment and (4) that the trial court erred in its judgment and sentence in finding that restitution was due to Ann Neimann in the amount of $4,000. We overrule grounds of error Numbers (1) and (2), sustain in part grounds of error Numbers (3) and (4), reform the judgment and sentence of the trial court, and as reformed, affirm the judgment of the trial court.

In his ground of error number one, Bruni challenges the sufficiency of the evidence. Tex.Pen.Code Ann. § 31.03 (Supp.1983) provides:

(a) A person commits an offense [theft] if he unlawfully appropriates property with intent to deprive the owner of property.

(b) Appropriation is unlawful if:

(1) it is without the owner's effective consent....

Tex.Pen.Code Ann. § 31.01(4) and (2) (1974) provides:

(4) "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(A) induced by deception or coercion....

(2) "Deception" means:

(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true....

Appellant correctly states the law to be that the evidence must be sufficient to show that Bruni appropriated over $10,000 with intent to deprive the owner of such funds by creating or confirming a false impression of fact, which Bruni did not believe, and which affected the owner's judgment in the transaction. *McClure v. State*, 648 S.W.2d 667, 677 (Tex.Cr.App. 1983) (opinion on State's motion for rehearing). The thrust of Bruni's argument is that he merely obtained the money pursuant to a contract which he partially performed and that he failed to return the money as agreed, after failure to perform fully under the contract. Thus, he contends, the evidence is insufficient to show that promises of Bruni were false at the time of the appropriation. We disagree.

The evidence is uncontradicted and appellant admitted that he received a total of $40,000 from John Ross and his wife Betty Ross. There is abundant testimony in the record from which the jury could believe beyond a reasonable doubt that Bruni obtained the money from Ross *et ux.* by representations which Bruni knew to be false at the time they were made and which created a false impression of fact affecting the judgment of Ross *et ux.* in the delivery of the $40,000 to Bruni. After courting John Ross' sister Ann Neimann (Ann) for approximately a year, Bruni met John and Betty Ross (John and Betty) at the Little Rock home of relatives of John and Ann. Bruni was born in Mexico under the name of Alejandro Baraja. After his family moved to the United States, he changed his last name to Bruni.

Bruni represented to John and Betty that: he was a member of the prominent, wealthy Bruni family of Laredo; he had existing electronic and cabinet businesses in Austin that were "really going well"; he had been awarded numerous bids from the State Board of Control; he was "making all this money" and needed to expand; he wanted to open shops in Lockhart and possibly New Braunfels; he needed money for the expansion; he planned to marry Ann; he wanted to put the business in the family and that he believed in families living together. He further told John and Ann that: the expanded business would make office furniture, school desks, etc., for which he would be awarded bids from the "I.R.S." and the State Board of Control; the parent company, a corporation to be formed, would be called Bruni-Ross Enterprises, with subdivisions under the parent company, one of which would be South Texas Mills at Lockhart; when the parent company was formed, it would be owned fifty percent by John and Betty and fifty percent by Bruni and Ann and that if John and Betty at any time became unhappy, they could "have their money back."

While making the representations he showed to John and Betty: instruments purporting to be awards of bids from the State Board of Control; his personal financial statement which indicated he had a net worth of $3,764,346, consisting of $3,290,000 in real estate, $165,886 in cash, $233,860 in accounts receivable and other assets; a resume indicating that he had attended the Universities of Alaska, Colorado, Arizona, and Texas, the Institute of Applied Sciences in Chicago and that he had received degrees in Electrical Engineering and Business Administration; maps and plots of real estate subdivisions where the company would engage in development.

Before Bruni's marriage to Ann on April 24, 1977, he made similar representations to Ann concerning his family background and indicated he was doing very well in his businesses. Prior to the marriage, Ann learned from her brother and sister-in-law that they were planning to go into business with Bruni. Bruni told Ann that he wanted to make the venture a family business corporation, with all the family to be involved

in five or six mills in Texas. She said he painted a "very rosy picture."

On February 11, 1977 Bruni signed a skeletal contract with John and Betty, in which he acknowledged receipt from them of $10,000, with additional sums of $10,000 to be paid by them on April 5, 1977 and another $10,000 in the first week of June, 1977. On receipt of the final payment, a formal agreement was to be signed; in the meanwhile, John and Betty were to be silent partners. In reliance on the promises, John and Betty sold their home near Houston; John quit his job; Betty sold her beauty salon and they moved to New Braunfels. John was assured by Bruni that he would be put on the payroll. After they moved to New Braunfels, Bruni obtained another $10,000 (bringing the total to $40,000) from John and Betty on a representation that he needed the money to make some sort of bond and that if they wanted "the business to go," he had to have the money.

Though Bruni had previously leased a building in Lockhart and had leased some equipment worth $4,262.52, the business never got started. No work was ever completed. The building and equipment were subsequently repossessed. The $40,000 was supposed to be banked in the company name at the First National Bank in New Braunfels but such was not done. Suffice it to say that all material representations were proved to be false.

John learned that creditors were not being paid and that insufficient checks had been given by Bruni. When queried about their investment, Bruni always had an explanation—that the money was in another place or in another bank, that it "was taken care of" and that he would show it to John and Betty. John Ross finally demanded that the money be returned. Bruni gave him a note for $43,000 ($40,000 for the investment and $3,000 for unpaid salary). When Ross asked about the equipment, which they discovered to be missing, Bruni told him that it had been sent back for the motors to be re-wired for larger capacity. Finally, upon repeated demands for the return of the money, Bruni supposedly went to Laredo on a Thursday, came back on Sunday, and at a meeting with John, Betty, Ann and an employee, announced that he did not have the money. At the same time Bruni admitted that he was an "alias," that his real name was not Bruni. Ross stated that Bruni told him he had invested the money in a pipeline from "Laredo to the United States."

While Bruni was gone to Laredo, John, Betty and Ann went to the South Texas Mills office. There they found that Bruni had opened bank accounts in some seven banks in central Texas. The records were obtained and through voluminous exhibits, the state proved his system of moving sums of money from bank to bank and issuing "hot checks." Except for a rather nominal sum, it could not be established that the $40,000 was used for its intended and promised purpose, i.e., investment in the business. Some of it was traced to Bruni's own use. He could not account for the remainder.

Immediately after the encounter with John, Betty and Ann in October, 1977, Bruni fled (leaving his son by another marriage with Ann) and was not seen again by the parties until October, 1982, the date of trial. Authorities finally located him in Seaford, Delaware, from which he was extradited for trial.

Bruni testified. He admitted telling John, Betty and Ann that he was Italian. He was vague as to who first brought up the business venture but acknowledged receiving the money. He admitted giving the "hot checks," admitted flight because he thought he was going to be arrested the next day, admitted his parents had lived in San Antonio for twenty years, acknowledged that he did not have any of the various assets on the financial statement he showed to John and Betty and admitted putting some of the money given to him by John and Betty in his own personal account. He said he did not have the educational degrees shown on his resume and that the only university he attended was in Alaska—for one course. He made no explanation of what he did with the $40,000.

■ In determining the sufficiency of the evidence to support a criminal conviction, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Carlsen v. State,* 654 S.W.2d 444, 448 (Tex.Cr.App. 1983) (opinion on State's motion for rehearing).

■ We hold that the evidence in the instant case is sufficient to reasonably support the jury's finding of guilt. We turn next to Bruni's contention that the trial court erred in permitting evidence to be elicited before the jury of confidential communications between Bruni and his former wife, Ann.

Texas Code Cr.P.Ann. art. 38.11 (1979) provides:

Art. 38.11. Husband or wife as witness

Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution.

■ We agree with the derivation and interpretation of the present article, as construed in 3 L. Simkins, *Texas Family Law with Forms* § 33.2 at 656–58, (Speer's 5th Ed.1976):

The husband-wife privilege in criminal cases is controlled by article of the Texas Code of Criminal Procedure.[54] The first section of this article creates a privilege as to confidential communications analogous to that created in the civil statute.

The second section, however, creates an absolute disqualification. This distinction may be clarified by a brief review of the history of the criminal statute.

The original enactment,[55] provided, "Neither husband or wife shall, in any case, testify as to communications made by one to the other while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation subsisted."

Another section[56] provided: "The husband and wife may, in all criminal actions, be witnesses for each other; but they shall, in no case, testify against each other, except in a criminal prosecution for an offense committed by one against the other."

Article 794 conferred on the spouse the privilege of excluding communications between the spouses. This was a mere privilege that had to be claimed to be effective.[57] Article 795, on the other hand, established an absolute disqualification, which did not have to be claimed by the defendant to be operative. The statute simply excluded the adverse testimony of a defendant's spouse. *One statute created a privilege, the other created a disqualification.*

In 1925, these two statutes relating to criminal cases were merged into a single statute, which provided: "Neither husband nor wife shall, in any case, testify as to communications made by one to the other, while married; nor shall they, after the marriage relation ceases, be made witnesses as to any such communication made while the marriage relation existed, except in a case where one or the other is prosecuted for an offense; and a declaration or communication made by the wife to the husband, or by the husband to the wife, goes to extenuate or justify an offense for which either is on trial. The husband or wife may, in all criminal actions, be witnesses for each other; but they shall in no case testify against each other except in a criminal prosecution for

an offense committed by one against the other."[58]

Thus, the 1925 enactment combined Articles 794 and 795, and provided for (1) a privilege as to communications between husband and wife, and (2) a disqualification as to adverse testimony by the defendant's spouse. *As was the case in the former statutes, the privilege could be waived; the disqualification could not.*

In 1965, the legislature re-wrote the latter part of the provision to facilitate the prosecution of crimes of violence against children by either of their parents. The first part of the statute, creating the privilege as to confidential communication and the disqualification as to adverse testimony, remained unchanged. Likewise, the 1973 amendment left the first section of the statute substantially unchanged, and that section which creates the privilege and disqualification employs substantially the same language as that found in the original statutes.

Thus, *the present statute creates a privilege that may be waived and a disqualification that is absolute.*

---

[54] CCP art. 38.11.

[55] Former CCP art. 794 (now repealed).

[56] Former CCP art. 795 (now repealed).

[57] *Gross v. State,* 61 [Tex.] Crim. [R.] 176, 135 S.W. 373 (letters); *Johnson v. State,* 95 [Tex.] Crim. [R.] 483, 255 S.W. 416.

[58] CCP (1925) art. 714. (now repealed).

(emphasis added and footnotes 59–61 omitted).

■ Article 38.11, *supra,* contains an *absolute disqualification* of one spouse as a witness against the other in a criminal case. It also (as did its predecessors) creates a *privilege* which can be waived by the party entitled to claim the same. Thus, as to the absolute disqualification, the Court of Criminal Appeals has consistently held that it is reversible error for the State to call the defendant's wife as a witness and to thereby force him to object in the presence of the jury when this is done in such a manner as to convey to the jury the impression that the wife, if allowed to testify, would rebut defensive testimony previously

given. *Stewart v. State,* 587 S.W.2d 148, 153 (Tex.Cr.App.1979); *Johnigan v. State,* 482 S.W.2d 209 (Tex.Cr.App.1972). The absolute prohibition against adverse spousal testimony, given while the parties are married, cannot be waived by failure to object. *Johnigan v. State, supra.*

■ Once the marital relationship is terminated by divorce, the absolute disqualification of a spouse is no longer applicable. He or she then becomes a competent witness against the other, except that there remains a privilege, available to the defendant, as to communications made while the marriage relationship existed. *Bear v. State,* 612 S.W.2d 931 (Tex.Cr.App.1981); *Foster v. State,* 493 S.W.2d 812 (Tex.Cr.App.1973). *See* 1 *Branch's Annotated Penal Code of Texas* § 173 (2d Ed.1956). Therefore, a divorced wife may testify to any matters which are not confidential communications and the mere fact that she was the wife of the defendant when the matter sought to be elicited occurred would not prima facie make such matters privileged. *Curd v. State,* 217 S.W. 1043 (Tex.Cr.App.1920).

■ Where the validity of the marriage is in issue, as for example whether a common law marriage existed, the Court of Criminal Appeals has stated that it applies the rule applied in civil cases. *Krzesinski v. State,* 333 S.W.2d 149, 151 (Tex.Cr.App. 1960). In the instant case, Bruni's marriage to the witness Neimann was annulled in April, 1978, over four years before Ann gave her testimony at trial. Applying the rule in civil cases, it is clear that Ann's testimony was admissible, that she was not disqualified and that Bruni could not claim privileged communications. In *Garcia v. Garcia,* 232 S.W.2d 782, 783 (Tex.Civ.App. 1950, no writ), the court distinguished divorces and annulments, holding:

"All of the allegations as to why the marriage should be annuled relate to antenuptial causes.... A suit for annulment *presumes that there never was a valid marriage and that therefore it should be declared void ....*"

In *McDade v. McDade*, 16 S.W.2d 304, 305 (Tex.Civ.App.1929, no writ), an action for annulment was brought. Relying on the statute setting forth the residential requirements in divorce actions, the trial court denied the petition for failure to meet such requirements. The Court of Civil Appeals reversed the judgment and remanded the case for trial, stating:

> As will be observed, there is a distinction between the annulment of the marriage relation for antenuptial causes and a "divorce" for postnuptial causes. In the former, the marriage is declared to have been voidable or void *from the beginning*. In the latter the marriage, valid from the beginning, is declared terminated for the subsequent misconduct of one of the parties....

(emphasis added).

■ Once avoided by annulment, a voidable marriage is held to be void *ab initio*. *Home of the Holy Infancy v. Kaska*, 397 S.W.2d 208, 213 (Tex.1965). *See Texas Family Code Symposium*, 5 Tex. Tech L.Rev. 307, 314 and 4 Am.Jur.2d *Annulment of Marriage*, § 93, at 505–06 (1962).

■ Bruni's ground of error is likewise without merit for the reason that it does not comport with the only objection made in the trial court. Before this Court, he contends that "the trial court erred in permitting evidence to be elicited before the jury of confidential communications between appellant and his former wife during the marriage relationship." No such complaint was made at any time to the trial court, where his only objection was to *calling* Ann Niemann as a witness. Here, he attempts to assign as error the *content* of Ann's testimony; at trial his objection went solely to her *competency* to testify. For such reason his ground of error should be and is, overruled. *Hodge v. State*, 631 S.W.2d 754, 757 (Tex.Cr.App.1982); *Kipperman v. State*, 626 S.W.2d 507, 513 (Tex. Cr.App.1981). Bruni concedes that any objection to proposed testimony must state with particularity the reason therefor. *Wilson v. State*, 541 S.W.2d 174, 175 (Tex. Cr.App.1976). He argues that the ground of exclusion of the testimony was obvious to the trial court and opposing counsel. His reliance upon *Hill v. State*, 641 S.W.2d 543, 544 (Tex.Cr.App.1982) is misplaced.

In *Hill*, it was clear in appellant's motion to suppress that he was contending that his arrest was illegal and that any evidence obtained therefrom was inadmissible. Such is not the case here. At trial, Bruni's objection was to the competency of his wife as a witness. At no time did he object on the grounds that her testimony constituted a privileged communication. We agree with Speer's analysis, *Simkins, supra* at 658:

> Thus the present statute [38.11] creates a *privilege* that *may be waived* and a *disqualification* that is absolute.

(emphasis added).

*See* C. McCormick, *Handbook of the Law of Evidence* § 87 at 176 (1954), where the author agrees with Wigmore that the communicating spouse is the holder of the privilege and that a failure by the holder to assert the privilege by objection is a waiver. As noted herein, Ann was a competent witness.

In *Johnson v. State*, 255 S.W. 416, 417 (Tex.Cr.App.1923), the State introduced several letters from the defendant to one Gladys Johnson, written at a time when under the theory of the State's case, she was his wife. The letters were admitted in evidence without objection. The Court in holding there was no error said:

> Our statute upon the subject embraces two phases. Article 795, C.C.P., forbids the wife to testify against her husband except in instances when he is charged with an offense against her.... Article 794 C.C.P. conferred upon the husband the privilege of refusing to testify to confidential communications by him to his wife, *and to have excluded* the letter written by him to her. [citation omitted] The statute did not forbid the use of the letters against him as it forbade the testimony of the wife against the husband. In one case it *established a privilege;* in the other a *disqualification*. He had *but to object*, and the court would not

have used the letters nor the testimony relating to them.... By his acquiescence in the receipt of the testimony and the letters, *he waived his privilege to exclude them.*

(emphasis added).

Bruni's only trial court objection—to the competency of his wife as a witness—was properly overruled. He waived any claim of privileged communications by failure to object on that ground. His ground of error number two is overruled.

■■■■■ In his third and fourth grounds of error he challenges the findings of the trial court as to the restitution amounts due John and Betty Ross ($43,000) and Ann Neimann ($4,000). Tex.Code Cr.P.Ann. art. 42.12 § 15(g) (Supp.1984) provides that the Board of Pardons and Paroles may adopt such reasonable rules not inconsistent with law, with respect to conditions to be placed on parolees and persons released to mandatory supervision. The article specifically states:

The conditions shall include the making of restitution or reparation to the *victim of the prisoner's crime,* in an amount not greater than such restitution or reparation as established by the court and *entered in the sentence of the court which sentenced the prisoner* to his term of imprisonment.

(emphasis added).

The judgment and sentence of the trial court, signed November 10, 1982, recites:

It is further a finding of this court that there is restitution due the victims in this case in the amount of $47,173.00. The apportionment of the restitution is as follows: $43,173.00 is due John and Betty Ross, and $4,000.00 is due Ann Neimann.

Appellant argues that since only John R. Ross was designated in the indictment as the owner of the funds appropriated, he can be the *only* victim of the offense and that the trial court erred in including his wife Betty Ross and Ann Neimann as victims. The State, in oral argument, conceded that Ann Neimann should not be named

as a victim. We agree. However, we do not agree with appellant that the court erred in naming Betty Ross as a victim. The record shows that the $40,000 appropriated by Bruni was jointly owned by John and Betty Ross as husband and wife. The $3,173 for unpaid salary due John was community property. Perforce, both were victims.

The judgment and sentence of the trial court is reformed to recite that there is restitution due only to John and Betty Ross in the total sum of $43,173. As reformed, the judgment is affirmed.