James M. BRIDDLE, Appellant,

v.

The STATE of Texas, Appellee.

No. 68990.

Court of Criminal Appeals of Texas, En ·Banc.

Sept. 23, 1987.

Allen C. Isbell, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., & Winston E. Cochran, Jr. & Joe Bailey, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

Appellant was convicted of capital murder. After the jury found the appellant guilty and answered affirmatively the two special issues submitted under Article 37.-071, V.A.C.C.P., the court imposed the death penalty as required by law. See Article 37.071, supra; V.T.C.A., Penal Code, §§ 12.31 and 19.03.

The indictment charged capital murder in two counts. In count one the indictment charged the capital murder of Bob Skeens while in the course of committing a rob-

bery. The second count of the indictment alleged the capital murder of Robert Banks while in the course of committing a robbery. Only the second count of the indictment was submitted to the jury.

Appellant does not challenge the sufficiency of the evidence to sustain the conviction nor the affirmative answers to the special issues submitted at the penalty stage of the trial.

Nine points of error are advanced by appellant. In two points he contends the trial court erred in excluding for cause two prospective jurors in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In another point of error he claims the court erred in excluding a prospective juror because of her views on the burden of proof in a criminal case. In appellant's fourth point of error he contends the trial court erred in admitting his oral confession. In his fifth point he contends the prosecutor erred in argument at the penalty stage in attacking his court-appointed counsel. In three other points of error he complains of the admission into evidence of communications between him and his former wife while the marriage relation still existed. In his last point he complains of the admission of an unadjudicated extraneous offense of robbery at the penalty stage of the trial.

In order to place our discussion of appellant's points of error in proper perspective we briefly summarize the facts.

The State's chief witness was Linda Joyce Fletcher, appellant's former wife. The record reflects the couple married in California. On February 14, 1980, the couple began hitchhiking to Florida with a few clothes and $30.00. They were joined in Arizona by Pamela Perillo. On February 22, 1980, after reaching Houston the three were hitchhiking near the Astrodome when they were picked up by the alleged deceased, Robert Banks. Banks was in the process of moving to another house and the three hitchhikers assisted him in moving some of his belongings. Banks treated them to dinner. When Banks paid for the meal, Fletcher and Perillo observed he had several hundred dollars in his wallet, and Perillo told appellant about the money.

Appellant, his wife (Fletcher) and Perillo spent the night at Banks' house and then helped him move other belongings the next day. In the process the appellant discovered Banks had some guns. When Banks took a shower appellant telephoned a friend in California and invited him to come to Texas as he (appellant) "had a pigeon out here with lots of money and guns." Appellant proposed a robbery, but the California friend declined.

Banks then took his three guests to a carnival and rodeo at the Astrodome. There Perillo told appellant she wanted to kill Banks and appellant answered "Okay." He then went off to do some "planning," telling Perillo to relax when she agitated to "do it tonight." After the rodeo Banks and his guests went to dinner and returned to Banks' house where they met Bob Skeens, Banks' friend from Louisiana, who had arrived there in his green Volkswagen.

On Sunday, February 24, Banks and Skeens left the house to get coffee and doughnuts for everyone. While they were gone appellant armed himself with a shotgun and Perillo got a handgun. While awaiting the return of the two men appellant jumped up and down with excitement. When Banks and Skeens returned Perillo hid in the bedroom and appellant got inside a closet. He began to make a tapping sound. When Banks reached to open the closet door the appellant jumped out announcing "This is a robbery."

Skeens got down on the floor and pleaded for mercy. Banks came toward the appellant, who struck him in the face with the butt end of the shotgun. Perillo came out of her hiding place and told Banks to get on the floor, "that it wasn't any joke." Perillo obtained a machete and cut up some rope and then she and the appellant tied Banks and Skeens with rope. After they were bound appellant and Perillo took the wallets from the two. Appellant took $800.00 from Banks' wallet and waved it around saying "he had it." Appellant ransacked the bedroom, taking clothes and a backpack. Perillo found a cassette record-

er and camera. Appellant took Skeens into the bedroom and told Skeens that he (appellant) had killed five people and two more didn't matter. Fletcher, appellant's wife, did not see what happened to Skeens, but she did see appellant loop a rope around Banks' neck. Fletcher was then ordered to wait in Skeens' green Volkswagen. About 20 minutes later Perillo came to the car with the shotgun wrapped in a blanket. She also brought out a machete, handgun and other items. Appellant brought out the backpack and a rifle. They drove in the Volkswagen to Dallas, where they abandoned it and took a bus to Colorado.

When Banks failed to appear for work for two days, his supervisor went to Banks' house to investigate. A man with the supervisor looked in a window and saw a body. The police who arrived at the scene found the bodies of Banks and Skeens, each bounded and with a rope around the neck. Dr. Joseph Jachimczyk, the Chief Medical Examiner, testified that each died from asphyxia due to strangulation with a rope.

On March 3, 1980, Perillo gave a statement to Denver, Colorado police and a description of appellant. With her consent they entered a room at a hotel in Denver and found appellant, his wife and two boys. The backpack was found in the room.

A Houston detective went to Denver and interviewed appellant and obtained an oral confession in which he told of his participation in the alleged offense. He admitted putting a rope around Banks' neck and pulling on it with Perillo until Banks was unconscious. He admitted he took the wallets, several hundred dollars, the machete and shotgun. He maintained his wife (Fletcher) was outside the house during the entire incident.

Appellant initially asserts that the court erred in excluding for cause, over objection, prospective juror, Robert E. Goodwin, who asserted his general opposition to the death penalty but was not disqualified under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Goodwin made clear at the outset of the voir dire examination that he was "against" the death penalty although he did not fault the system for having established such a penalty. It was a deep-seated feeling that he had thought about. When asked by the court if there was any reason that would preclude him from devoting his full attention to the case, Goodwin replied, "Well ... the only thing would be the death penalty I'm against that." When asked by the court if he could consider the infliction of the death penalty in a proper case, he answered that he did not see how his feelings could be altered. When asked about the special issues that could be submitted in a capital murder case, Goodwin told the prosecutor he did not want to directly contribute to "the death" and his conscience would bother him. When asked if he would vote "no" to a special issue because of his feelings against the death penalty, Goodwin stated he didn't know what he would do at that time. Upon further interrogation Goodwin told the prosecutor that he "probably would" vote "no" to a special issue because of his feelings about the death penalty, and later stated that he would do just that because of the capital punishment involved. Goodwin then told the defense counsel he would "probably vote no" to a special issue because he did not want to contribute to the death penalty, but he "did not know when it came right down to it." Subsequently, however, Goodwin told the prosecutor he would vote "no" to a special issue if he "knew it would result in the death penalty, yes." The court sustained the challenge for cause.

In Witherspoon v. Illinois, supra, the United States Supreme Court held that a prospective juror may not be excluded by the trial court for cause unless that person makes it absolutely and unmistakably clear that 1) he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, or 2) that the prospective juror's attitude towards the death penalty would prevent him from making an impartial decision as to the defendant's guilt.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the question

presented was whether Texas contravened the Sixth and Fourteenth Amendments of the United States Constitution as construed and applied in *Witherspoon* when it excluded members of the venire from jury service because they were unable to state under oath as prescribed by V.T.C.A., Penal Code, § 12.31(b), that the mandatory penalty of death or life imprisonment in a capital murder case would not affect their deliberations on any issue of fact.

The United States Supreme Court reversed the *Adams* conviction and set aside the death penalty imposed holding that *Witherspoon* and said § 12.31(b) may not coexist as separate and independent bases for excluding prospective jurors so as to permit exclusion under § 12.31(b) on a ground broader than permitted by *Witherspoon.* The Court noted, however, that although the State could, consistent with *Witherspoon,* use § 12.31(b) to exclude prospective jurors whose views in capital punishment are such as to make them unable to follow the law or obey their oaths.

*Adams* at 448 U.S. at p. 46, 100 S.Ct. at p. 2527, said:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but *also to answer the statutory questions without conscious distortion or bias.* The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality.

\* \* \* \* \* \*

"We repeat that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams,* 448 U.S. at p. 52, 100 S.Ct. at p. 2529.

The standard set out in *Adams* was as follows:

"This line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially*

*impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the fact impartially and conscientiously apply the law as charged by the court." 448 U.S. at 45, 100 S.Ct. at 2526. (Emphasis in original.)

In *Williams v. State,* 622 S.W.2d 116, 118 (Tex.Cr.App.1981), it was held that certain veniremen whose views on the death penalty would have prevented or substantially impaired their performance as jurors in accordance with their instructions were properly excused in light of *Witherspoon* and *Adams.* See also *Bass v. State,* 622 S.W.2d 101, 108 (Tex.Cr.App.1981); *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981); *Griffin v. State,* 665 S.W.2d 762 (Tex.Cr. App.1983); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984).

Still further in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the *Adams* standard was declared proper and preferable to the strict standards of *Witherspoon.* See also *Bell v. State,* 707 S.W.2d 52, 66 (Tex.Cr.App.1986). *Witherspoon* is no longer the standard for determining whether a challenge for cause by the State has been improperly granted. *Sharp v. State,* 707 S.W.2d 611, 620 (Tex. Cr.App.1986).

In *Wainwright v. Witt,* supra, the United States Supreme Court held in that case that in determining whether a prospective juror could be excluded for cause because of her views on capital punishment, the Court of Appeals, at minimum, erred in focusing unduly on lack of clarity of questioning of prospective jurors, and in focusing on whether her answers indicated that she would "automatically" vote against the death penalty.

There the Court wrote:

"We therefore take this opportunity to clarify our decision in *Witherspoon* and to reaffirm the above-quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment.

That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, *there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.* For reasons that will be developed more fully *infra, this is why deference must be paid to the trial judge who sees and hears the juror.*" [1] (Emphasis supplied.)

It is also to be observed that Article 35.16(b), V.A.C.C.P., provides in part:

"(b) A challenge for cause may be made by the State for any of the following reasons:

"(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction *or punishment.*" (Emphasis supplied.)

In fact, bias against the range of punishment applicable by law is a proper area of inquiry for both challenges for cause and peremptory challenges. *Mathis v. State,* 576 S.W.2d 835 (Tex.Cr.App.1979); *Mar-*

*tinez v. State,* 588 S.W.2d 954 (Tex.Cr.App. 1979).

■ We cannot conclude the court erred in sustaining the challenge for cause to prospective juror Goodwin. See *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986).

■ Next appellant contends the trial court erred in excusing for cause, over objection, prospective juror Beatrice Brock, in light of *Witherspoon v. Illinois,* supra.

Appellant candidly characterizes Brock as a vacillating prospective juror. This is perhaps an understatement. In answer to the court's questions she stated she had no objections to the death penalty because "that person is getting what he deserves." Soon, however, she explained she didn't "particularly believe in capital punishment really." She believed a person should be punished "but as far as getting the electric chair ... no." She stated she could find a person guilty but could not give the death penalty as punishment.

She told the prosecutor that to protect her personal feelings about the death penalty she would automatically vote "no" to one or the other of the special issues submitted. When asked if she would do that if she felt from the evidence the answers to the special issues should be "yes," she responded, "Well, in that case I would probably vote yes. In that case, I probably would." When the prosecutor returned to the same question later she answered, "Yes, I would vote no to one [special issue] because of my feelings." She then told the prosecutor that no matter what the facts were she would vote "no" to one or the other of the special issues to keep the judge from sentencing someone to die.

In response to interrogation by appellant's counsel she stated she could answer the special issues "yes" if the defendant "poisoned his own child or something like that," and that she could answer the special issues affirmatively if it was her duty

1. Texas cases have also emphasized the deference that must be given to trial court's rulings on voir dire examination where the court had heard the prospective juror's tone of voice and observed his demeanor, etc. See *Tezeno v.*

*State,* 484 S.W.2d 374 (Tex.Cr.App.1974); *Villareal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978); *Garza v. State,* 622 S.W.2d 85, 92 (Tex.Cr.App. 1981); *Smith v. State,* 683 S.W.2d 393, n. 5 (Tex.Cr.App.1984).

under the law and evidence. When then asked by defense counsel if she could affirmatively answer the second special issue on future dangerousness if it was supported by the evidence she replied, "I don't know." Later Brock stated she wouldn't want to but she could answer the second special issue affirmatively although "it would be a heavy burden because of my beliefs ... I don't believe in capital punishment."

However, upon reexamination by the prosecutor she again stated that she would answer one or the other special issue "no" to avoid the death penalty from being imposed because her feelings against the death penalty were "that strong" and that she felt in her heart that is what she would do. The record then reflects:

"Q. (by prosecutor) Just for the purposes of the record, if the evidence showed beyond a reasonable doubt that the answer should be yes to question No. 1 and question No. 2, because of your religious or moral feelings against the inflection of the death penalty, you would answer no to one of those two questions so the judge would have to sentence him to die? You would not participate in a man being sentenced to the death penalty?

"A. Yes, I would have to.

"Q. You would answer no?

"A. I would."

The court sustained the State's challenge for cause. The court explained from its observations and own questions that the prospective juror was confused in her answers, replying to the same question with different answers, that it (the court) could not ascertain that the prospective juror "could honestly find the facts and answer the questions in an affirmative manner if she was convinced beyond a reasonable doubt" because she was so strongly opposed to capital punishment. The court, in effect, further stated it had the definite impression that the prospective juror would be unable to impartially apply the law.

Deference must be paid to the trial judge who sees and hears the juror. *Wainwright*

*v. Witt*, supra. For that reason and in light of the authorities earlier discussed in the preceding point of error, we cannot conclude that the trial court erred in sustaining the challenge for cause to prospective juror Brock. The point of error is overruled.

In another point of error appellant contends the court erred in sustaining the State's challenge for cause to prospective juror Joann Zimmer.

The basis for the challenge appears to be founded on Article 35.16(b)(3), V.A.C.C.P., which provides for the exclusion of a venireman or prospective juror who "has a bias or prejudice against any phase of the law upon which the state is entitled to rely for conviction or punishment." It is the State's position that the prospective juror would hold the State to a greater burden of proof on the issue of guilt in a capital murder case than beyond a reasonable doubt.

The prosecutor explained the burden of proof in a criminal case to Zimmer, informing her the burden (beyond a reasonable doubt) was the same as in Municipal Court and in a capital murder case. Zimmer stated she would require proof "beyond all doubt" in a capital murder. In response to the court's inquiry whether she could follow the court's instructions as to the law on the burden of proof on the issue of guilt, she responded, "I still feel the same way." Later she added, "I am confused, I guess that I would need to be convinced beyond all doubt. That's what I want to say."

The defense counsel sought to rehabilitate the prospective juror by contrasting the burden of proof in a civil case with the burden of proof in a criminal case, then discussing circumstantial evidence with Zimmer, and eliciting from her that she would vote "guilty" if the State satisfied its burden "to a moral certainty beyond a reasonable doubt."

The prosecutor again inquired if Zimmer could follow the court's instruction on the burden of proof. She responded that she could if "beyond a reasonable doubt" and

"beyond all doubt" were the same thing. When it was made clear that it was not, Zimmer made known that she, as a juror, would require proof "beyond all doubt." Her final position was that she would required a higher standard of proof than the law requires. The court did not err in sustaining the challenge for cause. See and cf. *Bodde v. State*, 568 S.W.2d 344, 349 (Tex.Cr.App.1978), cert. den. 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 and cases there cited. See also *Hawkins v. State*, 660 S.W.2d 65 (Tex.Cr.App.1983); *Franklin v. State*, 693 S.W.2d 420, 424 (Tex.Cr. App.1985).

The point of error is overruled.

Appellant urges the court erred in admitting his oral confession in Denver, Colorado to Houston Police Detective Vernon West because it did not comply with Article 38.22, § 3(c), V.A.C.C.P., in existence at the time. Appellant insists that the fact that Nina Skeens Bryant found a machete in her deceased son's car after recovering it from the Dallas Police Department did not serve as "corroboration" and justify the admission of the oral confession.

West testified he investigated the scene of the homicide on February 27, 1980, and viewed the bodies. On March 4, 1980, he received a phone call from the Denver Police Department in which it was learned that Pamela Perillo had given a statement and had informed the Denver Police the green Volkswagen they had taken after the killings had been left in a Holiday Inn parking garage in Dallas near the bus station. Officer West called the Dallas Police Department and gave them this information. On March 4, 1980, Dallas Police Officer Michael Ramsey found the green Volkswagen and secured it. Dallas Police Officer H.O. Ford, a 17-year veteran, made an inventory search and recovered a shotgun, but he denied looking under the seats. The automobile was impounded. At 6:30 p.m. on March 4, 1980, Officer West left Houston for Denver, Colorado, arriving about 9:30 p.m. At 11 p.m. he began to interview the appellant, who was in custody in Denver. West gave the appellant his *Miranda* warnings, etc. Appellant refused to give a written confession to West, but made an oral confession in which appellant detailed how he, his wife, and Petrillo encountered the deceased Banks, the events that followed, the flight to Dallas in Skeen's green Volkswagen, the abandonment of the car and the taking of the bus to Denver. In the course of his oral confession appellant related how Petrillo obtained a machete which was used to cut the rope in order to tie the two men, and how the machete and the shotgun were taken along with the Volkswagen when they fled to Dallas. He related that the shotgun and the machete were left in the green Volkswagen.

Mrs. Nina Skeens Bryant testified that Bob Skeens, who had been killed, was her son, that she had been called by the Dallas Police Department and asked to claim her son's car which was then in the police pound. She went to Dallas and obtained the car, and on March 29, 1980, she found a machete under the front seat, between the springs and the seat; that she called an assistant district attorney in Houston and told him of her discovery. She had no idea as to whom the machete belonged and did not know of the oral confession. At trial the machete was positively identified by Robert Banks' brother as belonging to Banks. The machete was shown to have been used to cut rope to tie up the men, and was later stolen.

Article 38.22, § 3(c), V.A.C.C.P., in effect at the time, provided:

"Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed."

As a general rule oral confessions are not admissible. *Jimmerson v. State*, 561 S.W.2d 5 (Tex.Cr.App.1978); *McGilvery v. State*, 533 S.W.2d 24 (Tex.Cr.App.1976); *Smith v. State*, 514 S.W.2d 749, 752 (Tex. Cr.App.1974); *Pierson v. State*, 168 S.W.2d 256, 258–259 (Tex.Cr.App.1943). On this the State and appellant both agree. The above quoted statute provided an exception

to the general rule. As to the application of the exception, the State and the appellant express different views.

The State cites *Valtiero v. State*, 219 S.W.2d 73, 79 (Tex.Cr.App.1949), for the proposition that the statutory reference to finding physical evidence is "illustrative only, and not limitations on the statements which conduce to establish guilt, and which are found to be true." The State argues that appellant's oral confession was admissible because it identified the machete as both stolen property and as an instrument used in the commission of the alleged crime.

In *Valtiero*, supra, where a hat belonging to the victim was discovered by following the defendant's directions, this Court wrote:

"The facts here presented demonstrate that facts and circumstances may be stated by an accused which unquestionably are inculpatory and conduce to establish his guilt, and yet neither lead to the recovery of stolen property, or the instrument with which the offense was committed."

In *McGilvery v. State*, 533 S.W.2d 24, 26 (Tex.Cr.App.1976), this Court wrote in part:

"When a defendant's in-custody statement of facts or circumstances which conduce to establish his guilt is found to be true, the statute permits introduction of the statement at trial. The facts or circumstances stated must be shown to conduce to establish guilt by showing the statement led to the discovery of items or information not previously discovered by the State and must be incriminating. *Chase v. State*, Tex.Cr.App., 508 S.W.2d 605, cert. denied, 419 U.S. 840, 95 S.Ct. 71, 42 L.Ed.2d 68 (1974); *Ashley v. State*, Tex.Cr.App., 362 S.W.2d 847, cert. denied, 372 U.S. 956, 83 S.Ct. 955, 10 L.Ed. 2d 10 (1963); cf. *Smith v. State*, Tex.Cr. App., 514 S.W.2d 749."

Citing *McGilvery*, supra, Shelton v. State, 328 S.W.2d 445 (Tex.Cr.App.1959), and *Chase*, supra, appellant argues that (1) the facts must be found to be true, (2) must be incriminating and (3) must be found as a result of the defendant's oral statement. Appellant argues that appellant's oral statement did not lead to the discovery of the stolen machete, that Mrs. Bryant found the machete independent of the oral statement. Appellant argues that if the items or information are known to the police before an oral confession or statement is given the statement is not admissible. *McBride v. State*, 506 S.W.2d 887 (Tex.Cr. App.1975); *Smith v. State*, 514 S.W.2d 749 (Tex.Cr.App.1974); *Gifford v. State*, 630 S.W.2d 387 (Tex.App.-Austin 1982). Appellant then argues that if stolen property is discovered after an oral statement but not as a result of the oral statement, it is not admissible either.

The State calls our attention to several cases. In *Ashley* and *Lima v. State*, 362 S.W.2d 847, 851 (Tex.Cr.App.1962), where the conviction was set aside on other grounds, 319 F.2d 80 (5th Cir.1963), the defendants were jointly tried. *Ashley* and *Lima* were apprehended in New York after fleeing Houston in the deceased's car. When an F.B.I. agent emptied Lima's purse on a desk, Lima identified some keys as being the keys to the deceased's automobile. Up until then the agent "had no knowledge concerning the keys." This Court reasoned that Lima's oral statements were admissible under then Article 727, V.A.C.C.P. (1925), as an oral statement because the keys fit the ignition of the deceased's Lincoln automobile which was in police custody before Lima's arrest, and showed that the automobile had recently been under the control and in possession of the defendants. The Court cited *Valtiero* with approval.

In *McGilvery*, supra, the defendant remarked to a fellow prisoner "I didn't know the other dude was going to kill the lady." The fellow inmate reported this to the police who were surprised that more than one person was involved. Further lab tests were conducted and it was verified that at least two men had raped the victim. The accused's statement led to the discovery of information previously unknown which proved to be true and which proved incriminating. It was held admissible.

In *Chase* the appellant orally confessed to the murder, explaining that the plywood board found with the body was a table top from his brother's room. Three weeks later the police took the board to the said room and found it fit to the wall as described by appellant. The hinges on the board matched the holes on the wall and the metal eye hooks on the board could be hooked to the chains on the wall. The origin of the plywood board was unknown to the police prior to the defendant's statement. The oral statement was held admissible.

We know from *Valtiero* that the example given in the statute is illustrative only and not a limitation on the statements which conduce to establish guilt and shown to be true. Some case law indicates the oral confession or statement must lead to the recovery of the items or information before the oral confession or statement is admissible. The statute plainly requires only the statement asserts "facts or circumstances that are found to be true and which conduce to establish the guilt of the accused." The statute places no limitation upon the manner in which the facts asserted are found to be true. If a defendant orally confesses to the police to a murder and states he has thrown the murder weapon, a pistol, in a certain well, and the police search the well and find the pistol, whose location was previously unknown to them, there is no problem with the admissibility of the oral confession. Suppose, however, the police search the well and do not find the pistol, but on the next day a passing neighbor, who knows nothing of the oral confession, dips the bucket in the well and it comes up with the pistol, which he turns over to the police. The pistol is identified as the murder weapon. Can it be said the oral confession is not admissible because it did not lead to the recovery of the pistol by the police or its agents? The finding of the pistol by the passing neighbor supports the truth of the facts asserted by the defendant and conduces to establish his guilt, and establishes the reliability of the confession which is the concern of the statute involved.

We conclude that the finding of the machete by Mrs. Bryant under the circumstances described supported the facts asserted by the appellant and conduced to establish his guilt. The requirements of the statute were met. The court did not err in admitting the oral confession. The point of error is overruled. We need not determine whether in light of all the other evidence in the record whether the admission of the oral confession was harmless error beyond a reasonable doubt.

Appellant also contends the prosecutor committed fundamental error in his jury argument at the penalty stage of the trial "by attacking the noble office and function of an appointed lawyer defending a person accused of a capital crime."

The complained of argument reads:

"You are here because he has put you here. That's why we are all assembled here. Mr. Thomas [defense counsel] is right when he tells you that we're all advocates. They're doing their job. Somebody has to represent them, but it doesn't have to be me. I will tell you right now that I will not ever represent anybody like that. I probably could make a lot more money by moving my chair on the other side of that thing, but I will not. I may not become rich down here, but I feel good about what I do even though they may think it's just another case. It's not with me. I feel good about what I do. I feel good about these families over here and the people I represent. There have been times during the course of this trial when I wasn't feeling very well. In fact I was sick as a dog. I hope that didn't affect my temperament such that I may have done something that might have been offensive to you...."

There was no objection to such argument nor was any other form of relief requested.

Prior to the now complained of argument appellant's attorney Thomas had argued to the jury at the penalty stage of trial:

"It is now your job to answer these questions. This is your case. It is not my business. I'm an advocate. Pat McKenna [prosecutor] is an advocate.

After you get out of here, you will remember this the rest of your life. Pat McKenna and Al Thomas will probably try other cases together until they leave the DA's office. What I am saying is that it's your case not Pat McKenna's and not Al Thomas' and not Jim Sims'. It is your case to do whatever you want to do with it."

Later appellant's counsel, Jim Sims, argued to the jury prior to the complained of argument:

"As Mr. McKenna has told you and Mr. Thomas has told you, lawyers are advocates, advocates with a position. There are no victors here. There certainly would never be a victory for the State or for the families of the victims or for the defense lawyers or for the defendant himself. Mr. Thomas and I were appointed by the court to represent Mr. James Michael Briddle. It was something we didn't seek out. It was something that we didn't want to do. No one wants to be involved on this type of case because it is a life-and-death, a life-and-death judgment that we are a part of. That is something that I will have to live with as a lawyer for the remainder of my professional career. It's a heavy burden."

The argument of the prosecutor was obviously in response to the inference left by defense counsel argument that it was an important case for the jurors but just another for the prosecutor who would go on trying cases until he left the district attorney's office. The argument, as the State concedes, should not have been made and was improper, but does the unobjected to argument in the context in which it was made at the penalty stage of the trial call for reversal?

■ The general rule is that any impropriety in the prosecutorial argument is waived by a defendant's failure to make a proper and timely objection. *Romo v. State*, 631 S.W.2d 504 (Tex.Cr.App.1982); *Sanchez v. State*, 589 S.W.2d 422 (Tex.Cr. App.1979). An exception exists where the prosecutor's argument is so prejudicial that an instruction to disregard will not cure the

harm. *Romo v. State*, supra; *Smith v. State*, 541 S.W.2d 831 (Tex.Cr.App.1976); *Rodriguez v. State*, 530 S.W.2d 944 (Tex. Cr.App.1975).

■ Appellant calls attention to *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974), and *Bray v. State*, 478 S.W.2d 89 (Tex.Cr. App.1972), in both of which the conviction was reversed because of similar jury argument. In *Boyde* the prosecutor argued that defense counsel had insinuated that one day the prosecutor would be "out on the other side" and added "you'll never find me defending criminals in this or any other county. You will never find me accepting stolen money, stolen merchandise as a fee. You will never find me standing up here and trying to get a murder...." The objection was overruled and the murder conviction was reversed.

In *Bray* the prosecutor argued that he was grateful to be employed by the people of Dallas County "and not the likes of him and ... not representing this sort of thing ... I am grateful that I don't have to make my living that way ... make my living representing a man who first set up the robbery...." See also *Lewis v. State*, 529 S.W.2d 533 (Tex.Cr.App.1975) (wherein the prosecutor argued that he had "taken a solemn oath to God to seek justice. You judge whether or not we have done it. No such oath bears on either of these [defense] attorneys.") Both *Bray* and *Lewis* resulted in reversal despite the fact that the objections were not properly preserved, the court holding that an instruction to disregard would not have cured the prejudicial effect of the statement.

In *Todd v. State*, 598 S.W.2d 286, 296, 297 (Tex.Cr.App.1980), it was stated:

"It is settled that the approved general areas of jury argument, within which all proper arguments must fall re (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Dunbar v. State*, 551 S.W.2d 382 (Tex.Cr.App.1977); *Alejandro v. State*, 493 S.W.2d 230 (Tex. Cr.App.1973). Even when an argument exceeds the permissible bounds of the

above areas, such will not constitute reversible error unless, *in light of the record as a whole*, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused into the trial proceeding. *Kerns. v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977); *Thompson v. State*, 480 S.W.2d 624 (Tex.Cr.App. 1972)." (Emphasis added.)

In *Borgen v. State*, 672 S.W.2d 456 (Tex. Cr.App.1984), this Court noted that almost every right, constitutional or statutory, may be waived by failure to object. In *Borgen* this Court held that the remark by the prosecutor, unobjected to by the defendant, that "as long as lawyers are for hire, justice is for sale" was not so prejudicial under the circumstances as to call for the reversal of the sexual abuse conviction or to reflect a violation of due process, though the argument was improper and the phrase should not have been used.

Likewise in the instant case reviewing the argument in light of the record as a whole, we do not find the unobjected to argument to call for reversal or to reflect a violation of due process even though the argument was not proper and should not have been made.

The point of error is overruled.

In three points of error appellant contends the trial court erred in permitting his former wife, Linda Fletcher (1) to testify that during the marriage he told her he wanted to be like Charles Manson and have women groupies, (2) to testify that during the marriage he told her he wanted her to have sex with truck drivers in exchange for rides, and (3) to testify that during the marriage he told her he went into the bathroom on the bus and threw the deceased's credit cards out the window.

The record shows that the appellant and the witness were married on June 12, 1979, and were married at the time when the alleged offense occurred. Subsequently she filed a petition in California to nullify the marriage, and a final judgment dissolving the marriage was entered on April 13, 1981. At the time of trial the witness was no longer appellant's wife. She had received five years, probated, for aggravated robbery growing out of the same transaction.

Appellant relies upon the provisions of Article 38.11, V.A.C.C.P.,[2] in effect at the time of appellant's trial in support of his three points of error. The first section of the statute creates a privilege as to confidential communications and the second section creates an absolute disqualification with certain exceptions. This distinction must be kept carefully in mind.[3]

■■■ Under Article 38.11, supra, when the witness is still the spouse of the defendant the witness is absolutely disqualified with certain exceptions. This disqualification cannot be waived. See *Stewart v. State*, 587 S.W.2d 148, 154 (Tex.Cr.App. 1979). Where the witness is the ex-wife or ex-husband of the defendant the witness is no longer disqualified and is competent to testify, *Robinson v. State*, 487 S.W.2d 757 (Tex.Cr.App.1972), and *Bear v. State*, 612 S.W.2d 931, 932 (Tex.Cr.App.1981). The privilege in the first section of the statute remains after the marriage relation ceases with an exception. Unlike the absolute disqualification the privilege can be waived. *Johnson v. State*, 95 Tex.Cr.R. 483, 255 S.W. 416, 417 (1923); *Bruni v. State*, 669 S.W.2d 829 (Tex.App.-Austin 1984).

---

**2.** Article 38.11, V.A.C.C.P. (Husband or wife as witness), provides in pertinent part:

"Neither husband nor wife shall, in any case, testify as to communications made by one to the other while married. Neither husband nor wife shall, in any case, after the marriage relation ceases, be made witnesses as to any communication made while the marriage relation existed except in a case where one or the other is on trial for an offense and a declaration or communication made by the wife to the husband or by the husband to the wife goes to extenuate or justify the offense. The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution."

**3.** A review of the history of the statute will clarify the distinction. See 3 L. Simkins, Texas Family Law with Forms, § 33.2 at 656–58 (Speer's 5th Ed.1976).

■ In the instant case the witness, Linda Fletcher, no longer the wife of the appellant, was a competent witness for the State. The privilege against communications during marriage which appellant could have claimed was waived when he did not object to the interrogation of his former wife in the three instances made the basis of three points of error.[4] Appellant's points of error are overruled.

■ Appellant further complains the court erred at the penalty stage of this capital murder prosecution in admitting testimony of an unadjudicated, extraneous offense of robbery which occurred in California.

In *Smith v. State,* 676 S.W.2d 379 (Tex. Cr.App.1984), this Court wrote:

Article 37.071(a), V.A.C.C.P., provides:

" '... In the proceeding, evidence may be presented as to *any matter* that the court deems *relevant to sentence.* This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas.' (Emphasis supplied.)[8]

"Thus the trial court at the penalty stage of a capital murder trial has wide discretion in admitting or excluding evidence. *Robinson v. State,* 548 S.W.2d 63 (Tex.Cr.App.1977); *Felder v. State,* 564 S.W.2d 776 (Tex.Cr.App.1978), cert. den. 440 U.S. 950, 99 S.Ct. 1433, 59 L.Ed.2d 640; *Hammett v. State,* 578 S.W.2d 699 (Tex.Cr.App.1979); *McManus v. State,* 591 S.W.2d 505 (Tex.Cr.App.1979); *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr. App.1980). See also *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979).

"However, it has been said that this discretion extends only to the question of the relevance of the facts sought to be proved, and that Article 37.071(a), supra, does not alter the rules of evidence insofar as the manner of proof is concerned. See *Porter v. State,* 578 S.W.2d 742, 748 (Tex.Cr.App.1979).

"It has been consistently held that evidence of unadjudicated extraneous offenses are admissible at the penalty stage of a capital murder trial absent showing of unfair surprise. *Quinones v. State,* 592 S.W.2d 933 (Tex.Cr.App.1980), cert. den. 449 U.S. 893, 101 S.Ct. 256, 66 L.Ed.2d 121; *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr.App.1980); *Rumbaugh v. State,* 629 S.W.2d 747 (Tex.Cr. App.1982). And such admission does not render the proceedings fundamentally unfair or deprive an accused of due process and equal protections of the laws. *Williams v. State,* 622 S.W.2d 116 (Tex. Cr.App.1982), cert. den. 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876. See also *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr. App.1979).

"In *Green v. State,* 587 S.W.2d 167 (Tex.Cr.App.1979), it was held under Article 37.071, supra, that it was within the discretion of the court to admit the testimony of a deputy sheriff showing details of a similar murder committed approximately one month after the charged offense including verbal description of the body of the subsequent victim.

"And in *Davis v. State,* 597 S.W.2d 358 (Tex.Cr.App.1980), cert. den. 101 S.Ct. 388, this court held that it was not error in a capital murder trial for the court, after admitting four prior convictions of the defendant, to permit the State to call witnesses to testify as to the details of

---

**4.** Prior to the testimony by Linda Fletcher, appellant did object that she was absolutely disqualified from testifying because she was his wife. Evidence of the annulment was offered and the court ruled she was a competent witness. When appellant's motion in limine to prevent testimony as to communications between husband and wife while the marriage relation existed was presented to the court, appellant asked that no such testimony be permitted unless it was shown that a third person was

present. The prosecutor stated he had instructed the witness not to go into such conversations unless a third person was present, and that before going into those matters he was prepared to show that a third person was present, and that appellant would still have his right to object. The motion in limine was overruled. Even if it had been granted, it still was incumbent upon the appellant to timely object to each instance where he thought the privilege was violated. This he did not do.

the events which formed the bases of the prior convictions."

[8] "In *Earvin v. State,* 582 S.W.2d 794, 799 (Tex.Cr.App.1979), this court wrote:

"'Under Article 37.071(a), V.A.C.C.P., the court is authorized to admit any evidence which is relevant to the punishment, and the jury is authorized to consider this relevant evidence along with that adduced at the guilt-innocence phase of the trial.'"

We perceive no error in the admission of testimony concerning the California robbery at the penalty stage of the instant trial. The point of error is overruled.

The judgment is affirmed.

TEAGUE, J., concurs in the result.

CLINTON, Judge, concurring.

Having just recently argued against our causing the Court to adopt as state law a federal habeas statutory rule for reviewing substantial federal questions raised in state convictions, see *Clark v. State,* 717 S.W.2d 910 (Tex.Cr.App.1986) (opinion joining judgment, at 920), I do not reiterate my objections. Suffice to say that often "we but engage in an amiable fiction by pretending to give deference to a determination never made," *id.,* at 921.

The instant cause presents contrasting situations involving voir dire examination of venirepersons, namely Robert E. Goodwin and Beatrice Brock. Yet the Court seem to make the same analysis in each.

From the Court's resume of examination of Godwin there is no indication that the trial judge was troubled enough by his answers to resort to an examination of demeanor, tone and the like in order to decide the challenge for cause. Thus it is not a matter of paying deference to the trial judge, but whether the ruling made for the court is correct. Given his answers I agree the trial court did not err.

On the other hand Brock is characterized as a "vacillating" venireperson. In her case after the trial court sustained the challenge for cause by the State, the judge mentioned observations made as she answered questions and "confusion" in her answers leading to a stated impression of inability of Brock to perform her duties as

a juror because of her strong views against capital punishment. Since in my judgment the record sustains that impression, again I agree the trial court did not err.

As to points of error six, seven and eight pertaining to testimony of Linda Fletcher, at page 7, in note 4, the Court describes a hearing on appellant's motion in limine held by the trial court just before Fletcher would take the stand to testify *at the first stage of trial.* Manifestly, counsel was well aware of the marital communications privilege. The prosecutor gave assurances that he had instructed Fletcher to restrict her testimony to conversations with appellant in the presence of a third party, and he was prepared to demonstrate that was true in each instance; counsel for appellant seems to have accepted those assurances, requesting the showing be made in advance; but the trial judge demurred. In that context and apparently for those reasons the court overruled the motion—in effect it became moot.

From my reading of relevant portions of the statement of facts it appears that the prosecution did not show that a third party was present when the three statements complained of were made. Considering the bizarre nature of the first two and the inculpatory character of the third, one is at loss to comprehend an utter failure to object on either ground available, or both. Like other privileges, this one is given special protection. See Tex.R.Cr.Evid. Rules 104(a), 504(1) and 1101(b). Nevertheless, prior case law and now Rule 504(1)(c) make clear this privilege must be claimed.

With those observations I join the judgment of the Court.