In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00052-CR

                                                ______________________________

 

 

                                  JOHN RAYMOND CROSS,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the Sixth
Judicial District Court

                                                             Lamar County, Texas

                                                            Trial
Court No. 22783

 

                                                          
                                        

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            John
Raymond Cross, a retired officer of the Texas Department of Public Safety,
developed a gambling problem in his retirement years.  To finance his gambling, Cross Aborrowed@
$128,952.00[1]from
Thomas Hale Glover, a retired physician who was over sixty-five years of age.
Cross misrepresented to Glover that the money was actually being used to
finance two business ventures that would benefit Glover’s home town of Deport,
Texas.  As a result, Cross was convicted
by a jury for theft of property in excess of $100,000.00 but less than
$200,000.00 from an elderly individual[2] and
sentenced to twenty years’ imprisonment in the Texas Department of Criminal
Justice—Institutional
Division.  Cross appeals, complaining
that the indictment was defective and that the evidence was legally and
factually insufficient to support the verdict. 
We affirm the judgment of the trial court because (1) the indictment is
without fundamental defect, (2) complaint of any nonfundamental error in the
indictment is waived, and (3) the evidence is legally and factually sufficient
to support the verdict.

            Glover
met Cross at church, but later developed a personal relationship with him in
2005, after Glover became ill with cancer. 
Early on, Cross ran errands for Glover and helped with household
chores.  Then, in July 2006, Cross
approached Glover about a business venture involving the development of a door
striker plate Cross invented, for which Cross indicated he had received a
patent.  In fact, no patent had been
issued.  

            Glover
agreed to make an interest-free loan to Cross to help finance the venture; he
expected to be repaid.  The initial
$500.00 loan was made July 14, 2006. 
Other loans were made thereafter, mostly in larger amounts.  Glover continued to make interest-free loans
to Cross through March 2008, when the transactions were discovered by Glover’s
niece.  During a range of months, on
average, Glover wrote checks to Cross totaling $8,000.00 per month.[3]  The only documentation of the loans are
entries made by Glover in his day planner for the years 2007 through March
2008, indicating amounts paid to Cross, along with copies of the canceled
checks.

At some point, Cross told Glover
that Cross was paid $200,000.00 for his interest in the door striker venture,
but he no longer had the money because a lawyer in the Dallas area had stolen
it.  In fact, Cross was never paid
anything for the door striker venture.[4]  

            During
the same time period, Cross approached Glover with a second business venture in
need of financing, a trolling motor manufacturing business.  Cross told Glover that he planned to develop
a trolling motor he invented and that he would build a small plant in south
Deport that would employ twelve to fifteen people.  Cross managed to obtain money on a regular,
ongoing basis from Glover for this venture through a chain of
misrepresentations, beginning with a request for funds to obtain a patent on
the trolling motor.[5]  Next, Cross requested funding for an
engineer, and thereafter requested funds to purchase equipment to manufacture
the parts for the motor.  In time, Cross
invented more falsehoods to explain his need for additional funding,[6]
when in fact, the representations about the trolling motor venture were
entirely fabricated.  There was no
trolling motor business in need of financing; instead, the money Glover loaned
to Cross was used by Cross for gambling.

            Cross
told Glover he could not repay the loans right away because the trolling motor
equipment had been sabotaged.  Cross
maintained that he filed a lawsuit in Oklahoma to recover his losses and led
Glover to believe that he recovered a large sum of money from the lawsuit.  Cross explained to Glover that, because the
money was in a bank in Oklahoma, it would be awhile before he could get
it.  Glover received no further reports
on the status of these alleged funds before the discovery of Cross’ scheme.

            Glover
was motivated to finance Cross’ business ventures by Glover’s love for his
hometown of Deport.  Glover worked for
thirty years to build up the city, only to see it decline in his later years.
Cross led Glover to believe that his business ventures would bring jobs and
prosperity back to the city, which was experiencing rapid economic
decline.  Cross looked Glover in the eye,
shook his hand, and told Glover that he would repay him.  Glover believed Cross would keep his word.  

            Cross’
“house of cards” came tumbling down when Betsy and Jerome Chapman (Glover’s
niece and her husband) became concerned on discovering that Glover was involved
in a business venture with Cross.  The
Chapmans confronted Cross regarding the alleged business venture and became
convinced that Glover was being defrauded. 
Two days later, Cross visited Jerome Chapman at Chapman’s place of
business and admitted to Chapman that everything he told the Chapmans about the
invention was a lie—there was no patent and there was no invention.[7]  Cross simply took Glover’s money.  Thereafter, the Chapmans reported Cross to
law enforcement.  

            (1)        
The Indictment Is Without Fundamental Defect

            “An
indictment is a written instrument presented to a court by a grand jury
charging a person with the commission of an offense.”  Tex.
Const. art. V, § 12(b).

            The
sufficiency of an indictment is a question of law.  State v. Moff, 154 S.W.3d 599, 601
(Tex. Crim. App. 2004).  Because this
issue is based on undisputed facts, we will review de novo this issue of
law.  See generally Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997); Brossette v. State, 99 S.W.3d
277, 280 (Tex. App.—Texarkana 2003, pet. dism’d, untimely filed). Cross alleges
that, because the indictment summarily alleges “unlawful appropriation,” rather
than specifying the precise manner of unlawful appropriation,[8]
the indictment is fundamentally defective. 
In support of this position, Cross relies on Johnson v. State,
547 S.W.2d 599 (Tex. Crim. App. 1977). 
In that case, the indictment alleged unlawful appropriation, but failed
to specify the manner of unlawful appropriation, in accordance with Section
31.03 of the Texas Penal Code.  The court
concluded that, because the indictment failed to allege the specific type of
theft, the indictment was fundamentally defective.  Id.
at 600–01.

            Article
V, Section 12 of the Texas Constitution was amended in 1985, after the decision
in Johnson, to provide that the presentation of an indictment vests the
trial court with jurisdiction over the case. 
See Tex. Const.
art. V, § 12; see also Studer v. State, 799 S.W.2d 263, 272 (Tex. Crim.
App. 1990).  A defendant waives any
defect of form or substance in an indictment if no objection is made before the
date trial commences.  See Tex. Code Crim. Proc. Ann. art. 1.14(b)
(Vernon 2005).

            Not
all indictment defects are matters of substance such that a defendant must
object to them before trial or lose the right to complain on appeal.  Defects that render the instrument a
nonindictment are of the type that would render it impossible for the defendant
to know the offense with which he or she has been charged.  See Duron v. State, 956 S.W.2d 547,
550 (Tex. Crim. App. 1997); Mantooth v. State, 269 S.W.3d 68, 72 (Tex. App.—Texarkana 2008, no pet.).   Conversely, a charging instrument vests
jurisdiction in the trial court, and thus must be objected to before trial,
when the instrument is clear enough in its language that the defendant can
identify the offense alleged.  Teal v.
State, 230 S.W.3d 172, 180 (Tex. Crim. App. 2007).

            The
complained-of indictment in this case states, in pertinent part, that:

JOHN RAYMOND CROSS in Lamar County, Texas,
anterior to the presentment of this Indictment, did then and there unlawfully
appropriate, by acquiring or otherwise exercising control over property,
to-wit:  United States money, of the
value of $100,000 or more but less than $200,000 with intent to deprive the
owner, Thomas Glover, a person 65 years of age or older, of the property and
all of the said property was obtained pursuant to one scheme or continuing
course of conduct which began on or about July 1, 2006 and continued until on
or about April 1, 2008.

 

Even though the indictment does
not state the specific manner of unlawful appropriation, it charges unlawful
appropriation of funds with sufficient detail to permit identification of the
penal statute under which the State intended to prosecute.[9]  Thus, the State’s indictment did not contain “fundamental”
error.  See Mantooth, 269 S.W.3d
at 72.  

            (2)        Complaint
of any Nonfundamental Error in the Indictment is Waived

            To
preserve a complaint for appellate review, a party must generally have
presented to the trial court a timely request, objection, or motion that states
the specific grounds for the desired ruling, if they are not apparent from the
context of the request, objection, or motion. 
See Tex. R. App. P.
33.1(a); see also Tex. R. Evid.
103(a).  More specifically, Article
1.14(b) of the Texas Code of Criminal Procedure provides:

            If
the defendant does not object to a defect, error or irregularity of form or
substance in an indictment or information before the date on which the trial on
the merits commences, he waives and forfeits the right to object to the defect,
error, or irregularity and he may not raise the objection on appeal or in any
other postconviction proceeding. . . .

 

Tex.
Code Crim. Proc. Ann. art
1.14(b).

            Because
Cross failed to object to the indictment, he waived his right to complain on
appeal of any nonfundamental defect.  The
indictment here alleges that Cross “unlawfully” appropriated personal property
with the intent to deprive the owner of the property.  The State therefore alleged all that is
necessary to give Cross notice of the crime of which he was accused.  It is not necessary for the State to plead
the manner of acquisition or the circumstances surrounding the offense.  Berg v. State, 747 S.W.2d 800, 809
(Tex. Crim. App. 1984); Askari v. State, 129 S.W.3d 160, 165 (Tex.
App.—Texarkana 2003, pet. ref’d).

            (3)        The
Evidence Is Legally and Factually Sufficient to Support the Verdict

            In
his second and third points of error, Cross contends the evidence is legally
and factually insufficient because the evidence establishes only that, based on
Cross’ misrepresentations, Glover did not charge interest on the loans.  In other words, Cross’ misrepresentations
induced Glover only to extend the loans free of interest; the
misrepresentations did not induce Glover to extend the loans in the first
instance.  Cross contends this to be the
case because Glover never testified that Cross’ use of the money was a material
factor in making the loans.  That is,
Glover never testified that, had Cross borrowed the money for some other
reason, such as making improvements to his home,[10]
Glover would not have loaned Cross the money.

            In
reviewing the legal sufficiency of the evidence, we view all of the evidence in
the light most favorable to the verdict to determine whether any rational trier
of fact could have found the essential elements of the crime beyond a
reasonable doubt.  Laster v. State,
275 S.W.3d 512, 517 (Tex. Crim. App. 2009); Johnson v. State, 23 S.W.3d
1, 7 (Tex. Crim. App. 2000).

            When
conducting a factual sufficiency review, all evidence is viewed in a neutral
light, favoring neither party.  Steadman
v. State, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We are to determine if the evidence
supporting the verdict, although legally sufficient, is nevertheless so weak
that the verdict is clearly wrong or manifestly unjust or whether the verdict
is against the great weight and preponderance of the conflicting evidence.  Watson, 204 S.W.3d at 414–15.

            While
a factual sufficiency review allows a very limited degree of “second-guessing”
the jury, the review should be deferential, with a high level of skepticism
about the jury’s verdict before a reversal can occur.  Roberts v. State, 220 S.W.3d 521, 524
(Tex. Crim. App. 2007); Watson, 204 S.W.3d at 417.

            The
legal and factual sufficiency of the evidence should be measured by the
elements of the offense as defined by a hypothetically correct jury
charge.  Grotti v. State, 273
S.W.3d 273 (Tex. Crim. App. 2008); Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997).  Such a charge
accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State’s burden of proof or unnecessarily restrict
the State’s theories of liability, and adequately describes the particular
offense for which the defendant was tried. 
Villarreal v. State, 286 S.W.3d 321 (Tex. Crim. App. 2009); Malik,
953 S.W.2d at 240.  Cross does not argue
that the charge is incorrect or not one authorized by the indictment, and it
tracks the indictment and the statute that criminalizes the conduct involved.            

                        a.  Evidence of Deception

            The
jury was charged to determine whether Cross, pursuant to one scheme or
continuing course of conduct,[11]
committed the offense of theft by unlawfully appropriating property with the
intent to deprive the owner, Glover, a person sixty-five years of age or
older.  The jury was instructed that
appropriation of property is unlawful if it is without the owner’s effective
consent; that consent was not effective if induced by deception or
coercion.  Tex. Penal Code Ann. § 31.01(3) (Vernon Supp. 2009); § 31.03.

            Deception
was defined in the charge as: 

creating or confirming by words or conduct a false
impression of law or fact that is likely to affect the judgment of another in
the transaction, and that the actor does not believe to be true;

 

failing to correct a false impression of law or
fact that is likely to affect the judgment of another in the transaction, that
the actor previously created or confirmed by words or conduct, and that the
actor does not now believe to be true.

 

Tex.
Penal Code Ann. § 31.01(1)(A), (B).

            Thus,
we must determine whether the evidence is legally and factually sufficient to
prove that (1) Cross created a false impression of fact, which Cross did not
believe, and which was likely to affect Glover’s judgment in extending the loan,
or (2) Cross failed to correct a false impression of fact that he created,
which Cross no longer believed to be true, and which was likely to affect
Glover’s judgment in extending the loan. 
Bruni v. State, 669 S.W.2d 829, 831 (Tex. App.—Austin 1984, no
pet.).  The thrust of Cross’ argument is
that Cross’ misrepresentations did not induce Glover to extend the loans to
Cross, but only to make them interest free.

            This
case shares many similarities with that of King.  In that case, the evidence showed that King
deceived four individuals by representing that their money would be used for
the sole purpose of preparing portfolios of their start-up businesses to
present to investors in order to obtain financing.  Instead of preparing and presenting
portfolios to investors, King used the funds he collected for the sole purpose
of paying his personal expenses and making purchases of items for his personal
benefit, including payment of his personal credit card account, while
representing to his clients that their money was being used for the purpose of
obtaining millions of dollars in financing for their fledgling businesses.  In doing so, King created a false impression
of fact that affected the judgment of the four complainants.  Id. at 14.

            In
King, the court held that, based on these facts, a rational fact-finder
could have found that King had no intention of fulfilling his obligations to
his clients; his promises and assurances to perform “were merely a ruse to
accomplish theft by deception.”  Id. at 15.  Here, as in King, the record is
replete with deception.  Cross argues
that the following testimony by Glover establishes that Cross’
misrepresentations induced only the interest-free aspect of the loans, rather
than inducing Glover’s decision to make the loans:

Q. [BY THE STATE]    Okay. 
Why did you give him - - if this was some kind of business arrangement
and he was going to repay you, why was it, Doctor, that you gave him an
interest-free loan?

 

A.  The city
of Deport, that’s the love of my life. 
It is currently having a tough time economically, it’s declining
rapidly.  I don’t think there’s more than
one or two retail outlets in downtown Deport anymore.  Deport had a thriving community at one time,
especially when I was working.  When you
work for 30 years to build up something, and then you have to stand by and
watch it decline, that’s painful.

 

Q.  So the
interest-free loan was to help him build a business and attract business to
Deport?

 

A.  Yes, to
encourage him.  When I hear someone wants
to help Deport, well, I want to help them help Deport.

 

Q.  All right.

A.  The
interest-free - - I didn’t feel like charging him any interest on these loans
because I  was just thrilled that
somebody was trying to do something to help Deport.

 

In contrast, the evidence of
deception squelches the notion that there was a lack of inducement by deception
to make the loans.  Sergeant Ted Gibson,
an investigator for the Lamar County Sheriff’s office, testified that Glover
gave Cross $129,000.00 to finance his two fledgling  businesses. 
Glover testified that he paid $128,952.00 to Cross to develop the door
striker business and the trolling motor business. 

                        b.  The Door Striker Venture

            In
July 2006, Cross told Glover he invented and patented a door striker mechanism,
but needed funds to develop the business.[12]  On July 14, 2006, Glover wrote a check to
Cross in the amount of $500.00.  Glover
could not recall exactly how much money he gave Cross for the door striker
business, because Cross began to request funds to finance the trolling motor
business very soon after the initial $500.00 check was written.  The record is clear that the first $500.00
was given for the door striker business, followed soon thereafter by Cross= first request for funds to finance the
trolling motor business.[13]  Once Cross began requesting funds to finance
the trolling motor business, there is no evidence that he continued to request
funds from Glover for the door striker business.[14]  The record indicates that, indeed, Cross was
a member of a partnership, the purpose of which was to develop an adjustable
strike plate.[15]
While Cross told Glover this invention was patented when in fact it was not,
there is no evidence that Glover specifically relied on this misrepresentation
when he made the $500.00 loan to Cross. 
If the initial $500.00 loan is therefore removed from the equation,
there remains in excess of $128,000.00 that Glover nevertheless paid Cross for
the trolling motor venture.[16]


            We
further observe that additional misrepresentations regarding repayment of funds
intended to finance the door striker venture,[17] in
addition to the myriad misrepresentations regarding the trolling motor venture,
are reflective of Cross=
lack of intention to repay these funds at the time he received them.  See, e.g., Ellis v. State,
877 S.W.2d 380, 383 (Tex. App.—Houston [1st Dist.] 1994, pet. ref=d).

                        c.  Trolling for Money

            Myriad
misrepresentations flowed from Cross to Glover regarding the alleged trolling
motor business.  First, Cross told Glover
he had an invention for a trolling motor that would make a lot of money—which
would help the city of Deport because Cross would build a small plant in Deport
to employ twelve to fifteen people initially—but needed money for a patent
search.    Cross told Glover he needed
additional money to apply for a patent after the patent search was completed,
including money for related legal fees. 
Cross then required money to pay an engineer to draw up specifications
from which the motor could be manufactured. 
Because all of this would cost so much money, Cross intended to seek
corporate backing from the Indian Nation in Oklahoma. Cross then found Asomeone@
in the Sherman/Denison area who reportedly had agreed to manufacture a large
piece of very expensive equipment necessary for Cross to build the motors.  As all of this was ongoing, Cross reported
that he had unfortunately been stopped by the Oklahoma Highway Patrol, because
he did not have a permit to do business in Oklahoma.  Cross related to Glover that he would need
money for such a permit.  Thereafter,
Cross told Glover that the motor manufacturing business was doing well and that
he should not worry about getting his money. 
In the interim, however, something had gone wrong with the trolling
motor manufacturing business in Oklahoma, and Cross told Glover he needed to
retrieve his equipment from the Indian Nation quickly, and needed money to do
so.  

            Cross
then told Glover that he was meeting a representative from the Yamaha
Corporation in the Marshall/Longview area because Yamaha was interested in
backing him, but Cross needed money to get the equipment down to Marshall.  In reporting to Glover on the meeting with
the Yamaha representatives, Cross indicated that, as he was demonstrating the
motor, it began to emit smoke and fire. Glover was advised that the motor had
been sabotaged by the Indian Nation representative because he was angry with
Cross for taking his business elsewhere. 
Cross told Glover that he filed a lawsuit in Oklahoma to recover his
losses on the motor and that he recovered “quite a large sum.”  Because this money was in an Oklahoma bank,
Cross told Glover he could not pay it back on time because he could not get Ahold@
of it.  

            The
record shows that each of these statements was false.  Cross admitted to Chapman that everything he
told Chapman about the invention was a lie; he did not have a patent or any
paperwork.  He had simply taken the
money.  Cross admitted to Gibson that the
trolling motor business was a complete fabrication.  Cross explained to Gibson that he obtained
money from Glover because he, Cross, was “hooked on gambling.”  Glover testified, “Of course, I know now that
it was all a pack of lies.  But I didn’t
know it then.”  Further, Glover testified
to the following during trial:

Q. [BY THE STATE] 
Doctor, can you tell us how much money you gave to Mr. Cross over that
period from July 2006 to March of 2008?

 

A.  $128,952.00

Q.  Dr.
Glover, if you had learned that this defendant never had a trolling motor
business, would you have given him the money?

 

A.  No.

Q.  Dr.
Glover, if you had learned that this defendant never sold his interest in the
door striking business, and never got $200,000 for that, or whatever it was,
would you have loaned him that money?

 

A.  No.

Q.  Do you feel like you were deceived?

A.  Oh, I was deceived all right.

This testimony establishes Glover’s
reliance on Cross’ misrepresentations as an inducement to make the loans,
interest-free or otherwise, thus fulfilling the requirements of Section
31.01(1)(A) of the Texas Penal Code.  We
do not find the statute to allow the fine distinctions Cross asserts here.  The statute is violated when the actor makes
a false impression of fact, that the actor knows to be false, that is likely to
affect the judgment of another in the transaction.  Tex.
Penal Code Ann. § 31.01.  Cross’
misrepresentations meet this requirement, and “were merely a ruse to accomplish
theft by deception.”  See King, 17
S.W.3d at 15.  There is ample evidence of
deception in the record, which we find to be both legally and factually
sufficient to support the jury’s finding that Cross created false impressions
of fact that were likely to affect Glover’s judgment in extending loans to
Cross.  We overrule points of error
numbers two and three.

            We
find no fundamental error in the indictment and find a failure to preserve
error with respect to nonfundamental defects therein.  Further, and after reviewing the record in
the light most favorable to the verdict, we find that the evidence was
sufficient to support Cross=
conviction. A rational juror could have found that Cross had no intention of
fulfilling his obligations under the agreements with Glover.

            We
affirm the judgment of the trial court.

 

 

                                                                        Josh
R. Morriss, III

                                                                        Chief
Justice

 

Date Submitted:          January
20, 2010         

Date Decided:             February
9, 2010

 

Do Not Publish           

 

 











[1]Glover also loaned Cross money to help pay for medical
bills, but these amounts are not included in the figure listed above.  





[2]See Tex. Penal Code Ann. § 31.03 (Vernon Supp. 2009).





[3]Cross lured Glover into a second alleged business
venture involving a trolling motor manufacturing business.  It is not clear how the money was segregated
between the two alleged business ventures.





[4]Dave Stevens was a business partner of Cross in the
door striker venture.  Stevens testified
that he, Cross, and some others had registered the business name “Adjustable
Strike Defense” and formed a general partnership to obtain a patent for an
adjustable strike plate.  After trying
for several years to obtain a patent, the partnership was informed that the
design could not be patented.  Cross
helped finance the patent search in 2000 or 2001, but was not involved in
financing this project in 2006—07.  In early 2006, a Frank Garen “came on board”
and took care of the financing with the attorney.  Cross played no role in financing after
2001.  





[5]As was true of the door striker venture, Cross and
Glover did not execute documents to formalize financing for the trolling motor
business.  





[6]Included were requests to fund (1) the purchase of or
fabrication of trailers to haul heavy manufacturing equipment, (2) a permit to
do business in Oklahoma, (3) a fine for transporting equipment without a proper
permit,  (4) a redesign of the motor to
bring it up to engineering specifications, and (5) the transport of equipment
from Oklahoma to Texas. 





[7]The record does not specify whether Cross was
referring to the door striker or trolling motor venture; however, the context
of the testimony seems to indicate that reference was made to the trolling
motor venture.





[8]Cross points out that Section 31.03 of the Texas Penal
Code provides for three types of unlawful appropriation:

 

                (a)   A person
commits an offense if he unlawfully appropriates property with intent to
deprive the owner of property.

 

                (b)   Appropriation of property is unlawful if:

 

                      (1) it is without the owner’s effective
consent;

 

                      (2)
the property is stolen and the actor appropriates the property knowing it was
stolen by another; or

                  (3) property in the custody of any law
enforcement agency was explicitly represented by any law enforcement agent to
the actor as being stolen and the actor appropriates the property believing it
was stolen by another.

 

Tex. Penal Code Ann § 31.03.





[9]We note that the first page of the two-page indictment
contains the following language:

 

CHARGE

THEFT
OR [sic] PROPERTY MORE THAN $100,000

BUT
LESS THAN $200,000 ELDERLY

TEXAS PENAL CODE, SECTION 31.03





[10]The record contains evidence that certain improvements
were made to Cross’ house during the relevant time period.  In the spring of 2007, Cross put new siding
on his house and added new windows to the front of the house.  New cabinetry and kitchen appliances were
also added.  In addition, Cross acquired
two new boats in late 2006 or early 2007 and, in 2007, Cross acquired a new Jeep.  





[11]Where “amounts are obtained [by theft] pursuant to one
scheme or continuing course of conduct, whether from the same or several
sources, the conduct may be considered as one offense and the amounts
aggregated in determining the grade of the offense.”  Tex.
Penal Code Ann. § 31.09 (Vernon 2003); King v. State, 17 S.W.3d
7, 13 (Tex. App.—Houston [14th Dist.] 2000, pet. ref’d).

 





[12]In fact, the door striker mechanism was never
patented. 





[13]Glover did not provide a precise date he began giving Cross
money for the trolling motor business.





[14]The following is a breakdown of funds Glover paid to
Cross for the years 2006—2008:  funds
paid in 2006 totalled $7,675.00, funds paid in 2007 totalled $96,151.00, and
funds paid in 2008 totalled $25,126.00. 

 





[15]A strike plate attaches to a doorframe to reinforce
the door jam to keep the door from opening. 
The adjustable striker plate takes into account door movement which
causes a misalignment of the door throw or dead bolt and the traditional
striker plate.  





[16]The testimony regarding the precise amount of money
paid by Glover to Cross for each venture is not clearly defined.  We do know, however, that requests for money
to fund the trolling motor venture came very soon after the initial $500.00
payment by Glover.  The most conservative
approach would call for timing the financing of the door striker venture to the
date Glover clearly relates to that business. 
On March 2, 2007, Glover wrote a check to Cross in the amount of
$1,700.00.  While this may or may not have
been the first check Glover wrote to Cross for the trolling motor business,
this is the first check the record reflects to have been written in support of
the trolling motor business.  Therefore,
even if all of the funds paid by Glover through February 2007 were discounted
for evidentiary purposes—thus providing Cross with every conceivable benefit of
the doubt regarding his intentions to repay funds received to finance the door
striker venture—we, nevertheless, are left with an amount in excess of $116,000.00
paid to Cross for the trolling motor venture.  This figure fits within the range set forth in
the indictment.





[17]Cross told Glover that the door striker business was “going
to be a success”; that someone offered him money for it; that he was paid approximately
$200,000.00 for the sale of the door striker business; that he could not pay
Glover back because a lawyer had taken the money; and that he was going to get
the money from the lawyer, but the lawyer had stolen it.  Cross then told Glover that the FBI was using
that money to perform their projects, so Cross could not “get his hands on the
money.” Regarding these misrepresentations, Gibson testified that Cross told
him the door striker business “didn’t work out.”  Cross never assisted with the financing of
the door striker business after 2001.  Rather,
Cross attributed all of the money he had taken from Glover to gambling.