

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-09-00052-CR

_____

JOHN RAYMOND CROSS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Sixth Judicial District Court
Lamar County, Texas
Trial Court No. 22783

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

John Raymond Cross, a retired officer of the Texas Department of Public Safety, developed a gambling problem in his retirement years. To finance his gambling, Cross "borrowed" $128,952.00[1]from Thomas Hale Glover, a retired physician who was over sixty-five years of age. Cross misrepresented to Glover that the money was actually being used to finance two business ventures that would benefit Glover's home town of Deport, Texas. As a result, Cross was convicted by a jury for theft of property in excess of $100,000.00 but less than $200,000.00 from an elderly individual[2] and sentenced to twenty years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. Cross appeals, complaining that the indictment was defective and that the evidence was legally and factually insufficient to support the verdict. We affirm the judgment of the trial court because (1) the indictment is without fundamental defect, (2) complaint of any nonfundamental error in the indictment is waived, and (3) the evidence is legally and factually sufficient to support the verdict.

Glover met Cross at church, but later developed a personal relationship with him in 2005, after Glover became ill with cancer. Early on, Cross ran errands for Glover and helped with household chores. Then, in July 2006, Cross approached Glover about a business venture

---

[1]Glover also loaned Cross money to help pay for medical bills, but these amounts are not included in the figure listed above.

[2]*See* TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2009).

2

involving the development of a door striker plate Cross invented, for which Cross indicated he had received a patent. In fact, no patent had been issued.

Glover agreed to make an interest-free loan to Cross to help finance the venture; he expected to be repaid. The initial $500.00 loan was made July 14, 2006. Other loans were made thereafter, mostly in larger amounts. Glover continued to make interest-free loans to Cross through March 2008, when the transactions were discovered by Glover's niece. During a range of months, on average, Glover wrote checks to Cross totaling $8,000.00 per month.[3] The only documentation of the loans are entries made by Glover in his day planner for the years 2007 through March 2008, indicating amounts paid to Cross, along with copies of the canceled checks. At some point, Cross told Glover that Cross was paid $200,000.00 for his interest in the door striker venture, but he no longer had the money because a lawyer in the Dallas area had stolen it. In fact, Cross was never paid anything for the door striker venture.[4]

During the same time period, Cross approached Glover with a second business venture in need of financing, a trolling motor manufacturing business. Cross told Glover that he planned to develop a trolling motor he invented and that he would build a small plant in south Deport that

---

[3]Cross lured Glover into a second alleged business venture involving a trolling motor manufacturing business. It is not clear how the money was segregated between the two alleged business ventures.

[4]Dave Stevens was a business partner of Cross in the door striker venture. Stevens testified that he, Cross, and some others had registered the business name "Adjustable Strike Defense" and formed a general partnership to obtain a patent for an adjustable strike plate. After trying for several years to obtain a patent, the partnership was informed that the design could not be patented. Cross helped finance the patent search in 2000 or 2001, but was not involved in financing this project in 2006─07. In early 2006, a Frank Garen "came on board" and took care of the financing with the attorney. Cross played no role in financing after 2001.

would employ twelve to fifteen people. Cross managed to obtain money on a regular, ongoing basis from Glover for this venture through a chain of misrepresentations, beginning with a request for funds to obtain a patent on the trolling motor.[5] Next, Cross requested funding for an engineer, and thereafter requested funds to purchase equipment to manufacture the parts for the motor. In time, Cross invented more falsehoods to explain his need for additional funding,[6] when in fact, the representations about the trolling motor venture were entirely fabricated. There was no trolling motor business in need of financing; instead, the money Glover loaned to Cross was used by Cross for gambling.

Cross told Glover he could not repay the loans right away because the trolling motor equipment had been sabotaged. Cross maintained that he filed a lawsuit in Oklahoma to recover his losses and led Glover to believe that he recovered a large sum of money from the lawsuit. Cross explained to Glover that, because the money was in a bank in Oklahoma, it would be awhile before he could get it. Glover received no further reports on the status of these alleged funds before the discovery of Cross' scheme.

Glover was motivated to finance Cross' business ventures by Glover's love for his hometown of Deport. Glover worked for thirty years to build up the city, only to see it decline in

---

[5]As was true of the door striker venture, Cross and Glover did not execute documents to formalize financing for the trolling motor business.

[6]Included were requests to fund (1) the purchase of or fabrication of trailers to haul heavy manufacturing equipment, (2) a permit to do business in Oklahoma, (3) a fine for transporting equipment without a proper permit, (4) a redesign of the motor to bring it up to engineering specifications, and (5) the transport of equipment from Oklahoma to Texas.

his later years. Cross led Glover to believe that his business ventures would bring jobs and prosperity back to the city, which was experiencing rapid economic decline. Cross looked Glover in the eye, shook his hand, and told Glover that he would repay him. Glover believed Cross would keep his word.

Cross' "house of cards" came tumbling down when Betsy and Jerome Chapman (Glover's niece and her husband) became concerned on discovering that Glover was involved in a business venture with Cross. The Chapmans confronted Cross regarding the alleged business venture and became convinced that Glover was being defrauded. Two days later, Cross visited Jerome Chapman at Chapman's place of business and admitted to Chapman that everything he told the Chapmans about the invention was a lie—there was no patent and there was no invention.[7] Cross simply took Glover's money. Thereafter, the Chapmans reported Cross to law enforcement.

*(1)     The Indictment Is Without Fundamental Defect*

"An indictment is a written instrument presented to a court by a grand jury charging a person with the commission of an offense." TEX. CONST. art. V, § 12(b).

The sufficiency of an indictment is a question of law. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004). Because this issue is based on undisputed facts, we will review de novo this issue of law. *See generally Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Brossette v. State*, 99 S.W.3d 277, 280 (Tex. App.—Texarkana 2003, pet. dism'd, untimely filed).

---

[7]The record does not specify whether Cross was referring to the door striker or trolling motor venture; however, the context of the testimony seems to indicate that reference was made to the trolling motor venture.

5

Cross alleges that, because the indictment summarily alleges "unlawful appropriation," rather than specifying the precise manner of unlawful appropriation,[8] the indictment is fundamentally defective. In support of this position, Cross relies on *Johnson v. State*, 547 S.W.2d 599 (Tex. Crim. App. 1977). In that case, the indictment alleged unlawful appropriation, but failed to specify the manner of unlawful appropriation, in accordance with Section 31.03 of the Texas Penal Code. The court concluded that, because the indictment failed to allege the specific type of theft, the indictment was fundamentally defective. *Id.* at 600–01.

Article V, Section 12 of the Texas Constitution was amended in 1985, after the decision in *Johnson*, to provide that the presentation of an indictment vests the trial court with jurisdiction over the case. *See* TEX. CONST. art. V, § 12; *see also Studer v. State*, 799 S.W.2d 263, 272 (Tex. Crim. App. 1990). A defendant waives any defect of form or substance in an indictment if no

---

[8]Cross points out that Section 31.03 of the Texas Penal Code provides for three types of unlawful appropriation:

> (a)  A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.

> (b)  Appropriation of property is unlawful if:

> (1) it is without the owner's effective consent;

> (2) the property is stolen and the actor appropriates the property knowing it was stolen by another; or
> (3) property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another.

TEX. PENAL CODE ANN § 31.03.

objection is made before the date trial commences. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b) (Vernon 2005).

Not all indictment defects are matters of substance such that a defendant must object to them before trial or lose the right to complain on appeal. Defects that render the instrument a nonindictment are of the type that would render it impossible for the defendant to know the offense with which he or she has been charged. *See Duron v. State*, 956 S.W.2d 547, 550 (Tex. Crim. App. 1997); *Mantooth v. State*, 269 S.W.3d 68, 72 (Tex. App.—Texarkana 2008, no pet.). Conversely, a charging instrument vests jurisdiction in the trial court, and thus must be objected to before trial, when the instrument is clear enough in its language that the defendant can identify the offense alleged. *Teal v. State*, 230 S.W.3d 172, 180 (Tex. Crim. App. 2007).

The complained-of indictment in this case states, in pertinent part, that:

> JOHN RAYMOND CROSS in Lamar County, Texas, anterior to the presentment of this Indictment, did then and there unlawfully appropriate, by acquiring or otherwise exercising control over property, to-wit: United States money, of the value of $100,000 or more but less than $200,000 with intent to deprive the owner, Thomas Glover, a person 65 years of age or older, of the property and all of the said property was obtained pursuant to one scheme or continuing course of conduct which began on or about July 1, 2006 and continued until on or about April 1, 2008.

Even though the indictment does not state the specific manner of unlawful appropriation, it charges unlawful appropriation of funds with sufficient detail to permit identification of the penal

7

statute under which the State intended to prosecute.[9]   Thus, the State's indictment did not contain

"fundamental" error.   *See Mantooth*, 269 S.W.3d at 72.

*(2)      Complaint of any Nonfundamental Error in the Indictment is Waived*

To preserve a complaint for appellate review, a party must generally have presented to the

trial court a timely request, objection, or motion that states the specific grounds for the desired

ruling, if they are not apparent from the context of the request, objection, or motion.   *See* TEX. R.

APP. P. 33.1(a); *see also* TEX. R. EVID. 103(a).   More specifically, Article 1.14(b) of the Texas

Code of Criminal Procedure provides:

> If the defendant does not object to a defect, error or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding. . . .

TEX. CODE CRIM. PROC. ANN. art 1.14(b).

Because Cross failed to object to the indictment, he waived his right to complain on appeal

of any nonfundamental defect.   The indictment here alleges that Cross "unlawfully" appropriated

personal property with the intent to deprive the owner of the property.   The State therefore alleged

all that is necessary to give Cross notice of the crime of which he was accused.   It is not necessary

---

[9]We note that the first page of the two-page indictment contains the following language:

CHARGE
THEFT OR [sic] PROPERTY MORE THAN $100,000
BUT LESS THAN $200,000 ELDERLY
TEXAS PENAL CODE, SECTION 31.03

8

for the State to plead the manner of acquisition or the circumstances surrounding the offense. *Berg v. State*, 747 S.W.2d 800, 809 (Tex. Crim. App. 1984); *Askari v. State*, 129 S.W.3d 160, 165 (Tex. App.—Texarkana 2003, pet. ref'd).

> *(3)      The Evidence Is Legally and Factually Sufficient to Support the Verdict*

In his second and third points of error, Cross contends the evidence is legally and factually insufficient because the evidence establishes only that, based on Cross' misrepresentations, Glover did not charge interest on the loans. In other words, Cross' misrepresentations induced Glover only to extend the loans free of interest; the misrepresentations did not induce Glover to extend the loans in the first instance. Cross contends this to be the case because Glover never testified that Cross' use of the money was a material factor in making the loans. That is, Glover never testified that, had Cross borrowed the money for some other reason, such as making improvements to his home,[10] Glover would not have loaned Cross the money.

In reviewing the legal sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000).

---

[10]The record contains evidence that certain improvements were made to Cross' house during the relevant time period. In the spring of 2007, Cross put new siding on his house and added new windows to the front of the house. New cabinetry and kitchen appliances were also added. In addition, Cross acquired two new boats in late 2006 or early 2007 and, in 2007, Cross acquired a new Jeep.

When conducting a factual sufficiency review, all evidence is viewed in a neutral light, favoring neither party. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We are to determine if the evidence supporting the verdict, although legally sufficient, is nevertheless so weak that the verdict is clearly wrong or manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414–15.

While a factual sufficiency review allows a very limited degree of "second-guessing" the jury, the review should be deferential, with a high level of skepticism about the jury's verdict before a reversal can occur. *Roberts v. State*, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); *Watson*, 204 S.W.3d at 417.

The legal and factual sufficiency of the evidence should be measured by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009); *Malik*, 953 S.W.2d at 240. Cross does not argue that the charge is incorrect or not one authorized by the indictment, and it tracks the indictment and the statute that criminalizes the conduct involved.

### a. Evidence of Deception

The jury was charged to determine whether Cross, pursuant to one scheme or continuing course of conduct,[11] committed the offense of theft by unlawfully appropriating property with the intent to deprive the owner, Glover, a person sixty-five years of age or older. The jury was instructed that appropriation of property is unlawful if it is without the owner's effective consent; that consent was not effective if induced by deception or coercion. TEX. PENAL CODE ANN. § 31.01(3) (Vernon Supp. 2009); § 31.03.

> Deception was defined in the charge as:
>
> creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;
>
> failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true.

TEX. PENAL CODE ANN. § 31.01(1)(A), (B).

Thus, we must determine whether the evidence is legally and factually sufficient to prove that (1) Cross created a false impression of fact, which Cross did not believe, and which was likely to affect Glover's judgment in extending the loan, or (2) Cross failed to correct a false impression

---

[11]Where "amounts are obtained [by theft] pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." TEX. PENAL CODE ANN. § 31.09 (Vernon 2003); *King v. State*, 17 S.W.3d 7, 13 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

11

of fact that he created, which Cross no longer believed to be true, and which was likely to affect Glover's judgment in extending the loan. *Bruni v. State*, 669 S.W.2d 829, 831 (Tex. App.—Austin 1984, no pet.). The thrust of Cross' argument is that Cross' misrepresentations did not induce Glover to extend the loans to Cross, but only to make them interest free.

This case shares many similarities with that of *King*. In that case, the evidence showed that King deceived four individuals by representing that their money would be used for the sole purpose of preparing portfolios of their start-up businesses to present to investors in order to obtain financing. Instead of preparing and presenting portfolios to investors, King used the funds he collected for the sole purpose of paying his personal expenses and making purchases of items for his personal benefit, including payment of his personal credit card account, while representing to his clients that their money was being used for the purpose of obtaining millions of dollars in financing for their fledgling businesses. In doing so, King created a false impression of fact that affected the judgment of the four complainants. *Id.* at 14.

In *King*, the court held that, based on these facts, a rational fact-finder could have found that King had no intention of fulfilling his obligations to his clients; his promises and assurances to perform "were merely a ruse to accomplish theft by deception." *Id.* at 15. Here, as in *King*, the record is replete with deception. Cross argues that the following testimony by Glover establishes that Cross' misrepresentations induced only the interest-free aspect of the loans, rather than inducing Glover's decision to make the loans:

Q. [BY THE STATE]    Okay.   Why did you give him - - if this was some kind of business arrangement and he was going to repay you, why was it, Doctor, that you gave him an interest-free loan?

A.   The city of Deport, that's the love of my life.   It is currently having a tough time economically, it's declining rapidly.   I don't think there's more than one or two retail outlets in downtown Deport anymore.   Deport had a thriving community at one time, especially when I was working.   When you work for 30 years to build up something, and then you have to stand by and watch it decline, that's painful.

Q.   So the interest-free loan was to help him build a business and attract business to Deport?

A.   Yes, to encourage him.   When I hear someone wants to help Deport, well, I want to help them help Deport.

Q.   All right.

A.   The interest-free - - I didn't feel like charging him any interest on these loans because I  was just thrilled that somebody was trying to do something to help Deport.

In contrast, the evidence of deception squelches the notion that there was a lack of inducement by deception to make the loans.   Sergeant Ted Gibson, an investigator for the Lamar County Sheriff's office, testified that Glover gave Cross $129,000.00 to finance his two fledgling businesses.   Glover testified that he paid $128,952.00 to Cross to develop the door striker business and the trolling motor business.

> b.   *The Door Striker Venture*

13

In July 2006, Cross told Glover he invented and patented a door striker mechanism, but needed funds to develop the business.[12]   On July 14, 2006, Glover wrote a check to Cross in the amount of $500.00.   Glover could not recall exactly how much money he gave Cross for the door striker business, because Cross began to request funds to finance the trolling motor business very soon after the initial $500.00 check was written.   The record is clear that the first $500.00 was given for the door striker business, followed soon thereafter by Cross' first request for funds to finance the trolling motor business.[13]   Once Cross began requesting funds to finance the trolling motor business, there is no evidence that he continued to request funds from Glover for the door striker business.[14]   The record indicates that, indeed, Cross was a member of a partnership, the purpose of which was to develop an adjustable strike plate.[15]  While Cross told Glover this invention was patented when in fact it was not, there is no evidence that Glover specifically relied on this misrepresentation when he made the $500.00 loan to Cross.   If the initial $500.00 loan is

---

[12]In fact, the door striker mechanism was never patented.

[13]Glover did not provide a precise date he began giving Cross money for the trolling motor business.

[14]The following is a breakdown of funds Glover paid to Cross for the years 2006–2008:   funds paid in 2006 totalled $7,675.00, funds paid in 2007 totalled $96,151.00, and funds paid in 2008 totalled $25,126.00.

[15]A strike plate attaches to a doorframe to reinforce the door jam to keep the door from opening.   The adjustable striker plate takes into account door movement which causes a misalignment of the door throw or dead bolt and the traditional striker plate.

14

therefore removed from the equation, there remains in excess of $128,000.00 that Glover nevertheless paid Cross for the trolling motor venture.[16]

We further observe that additional misrepresentations regarding repayment of funds intended to finance the door striker venture,[17] in addition to the myriad misrepresentations regarding the trolling motor venture, are reflective of Cross' lack of intention to repay these funds at the time he received them. *See, e.g.*, *Ellis v. State*, 877 S.W.2d 380, 383 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

### c. Trolling for Money

Myriad misrepresentations flowed from Cross to Glover regarding the alleged trolling motor business. First, Cross told Glover he had an invention for a trolling motor that would make

---

[16]The testimony regarding the precise amount of money paid by Glover to Cross for each venture is not clearly defined. We do know, however, that requests for money to fund the trolling motor venture came very soon after the initial $500.00 payment by Glover. The most conservative approach would call for timing the financing of the door striker venture to the date Glover clearly relates to that business. On March 2, 2007, Glover wrote a check to Cross in the amount of $1,700.00. While this may or may not have been the first check Glover wrote to Cross for the trolling motor business, this is the first check the record reflects to have been written in support of the trolling motor business. Therefore, even if all of the funds paid by Glover through February 2007 were discounted for evidentiary purposes—thus providing Cross with every conceivable benefit of the doubt regarding his intentions to repay funds received to finance the door striker venture—we, nevertheless, are left with an amount in excess of $116,000.00 paid to Cross for the trolling motor venture. This figure fits within the range set forth in the indictment.

[17]Cross told Glover that the door striker business was "going to be a success"; that someone offered him money for it; that he was paid approximately $200,000.00 for the sale of the door striker business; that he could not pay Glover back because a lawyer had taken the money; and that he was going to get the money from the lawyer, but the lawyer had stolen it. Cross then told Glover that the FBI was using that money to perform their projects, so Cross could not "get his hands on the money." Regarding these misrepresentations, Gibson testified that Cross told him the door striker business "didn't work out." Cross never assisted with the financing of the door striker business after 2001. Rather, Cross attributed all of the money he had taken from Glover to gambling.

15

a lot of money—which would help the city of Deport because Cross would build a small plant in Deport to employ twelve to fifteen people initially—but needed money for a patent search. Cross told Glover he needed additional money to apply for a patent after the patent search was completed, including money for related legal fees. Cross then required money to pay an engineer to draw up specifications from which the motor could be manufactured. Because all of this would cost so much money, Cross intended to seek corporate backing from the Indian Nation in Oklahoma. Cross then found "someone" in the Sherman/Denison area who reportedly had agreed to manufacture a large piece of very expensive equipment necessary for Cross to build the motors. As all of this was ongoing, Cross reported that he had unfortunately been stopped by the Oklahoma Highway Patrol, because he did not have a permit to do business in Oklahoma. Cross related to Glover that he would need money for such a permit. Thereafter, Cross told Glover that the motor manufacturing business was doing well and that he should not worry about getting his money. In the interim, however, something had gone wrong with the trolling motor manufacturing business in Oklahoma, and Cross told Glover he needed to retrieve his equipment from the Indian Nation quickly, and needed money to do so.

Cross then told Glover that he was meeting a representative from the Yamaha Corporation in the Marshall/Longview area because Yamaha was interested in backing him, but Cross needed money to get the equipment down to Marshall. In reporting to Glover on the meeting with the Yamaha representatives, Cross indicated that, as he was demonstrating the motor, it began to emit

16

smoke and fire. Glover was advised that the motor had been sabotaged by the Indian Nation representative because he was angry with Cross for taking his business elsewhere. Cross told Glover that he filed a lawsuit in Oklahoma to recover his losses on the motor and that he recovered "quite a large sum." Because this money was in an Oklahoma bank, Cross told Glover he could not pay it back on time because he could not get "hold" of it.

The record shows that each of these statements was false. Cross admitted to Chapman that everything he told Chapman about the invention was a lie; he did not have a patent or any paperwork. He had simply taken the money. Cross admitted to Gibson that the trolling motor business was a complete fabrication. Cross explained to Gibson that he obtained money from Glover because he, Cross, was "hooked on gambling." Glover testified, "Of course, I know now that it was all a pack of lies. But I didn't know it then." Further, Glover testified to the following during trial:

> Q. [BY THE STATE] Doctor, can you tell us how much money you gave to Mr. Cross over that period from July 2006 to March of 2008?
>
> A. $128,952.00
>
> Q. Dr. Glover, if you had learned that this defendant never had a trolling motor business, would you have given him the money?
>
> A. No.
>
> Q. Dr. Glover, if you had learned that this defendant never sold his interest in the door striking business, and never got $200,000 for that, or whatever it was, would you have loaned him that money?

17

A. No.

Q. Do you feel like you were deceived?

A. Oh, I was deceived all right.

This testimony establishes Glover's reliance on Cross' misrepresentations as an inducement to make the loans, interest-free or otherwise, thus fulfilling the requirements of Section 31.01(1)(A) of the Texas Penal Code. We do not find the statute to allow the fine distinctions Cross asserts here. The statute is violated when the actor makes a false impression of fact, that the actor knows to be false, that is likely to affect the judgment of another in the transaction. TEX. PENAL CODE ANN. § 31.01. Cross' misrepresentations meet this requirement, and "were merely a ruse to accomplish theft by deception." *See King*, 17 S.W.3d at 15. There is ample evidence of deception in the record, which we find to be both legally and factually sufficient to support the jury's finding that Cross created false impressions of fact that were likely to affect Glover's judgment in extending loans to Cross. We overrule points of error numbers two and three.

We find no fundamental error in the indictment and find a failure to preserve error with respect to nonfundamental defects therein. Further, and after reviewing the record in the light most favorable to the verdict, we find that the evidence was sufficient to support Cross' conviction. A rational juror could have found that Cross had no intention of fulfilling his obligations under the agreements with Glover.

We affirm the judgment of the trial court.

18

Josh R. Morriss, III
Chief Justice

Date Submitted:     January 20, 2010
Date Decided:       February 9, 2010

Do Not Publish